## TURNER *v.* MURRAY, DIRECTOR, VIRGINIA DEPARTMENT OF CORRECTIONS

No. 84–6646.  Argued December 12, 1985—Decided April 30, 1986

WHITE, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and III, in which BRENNAN, BLACKMUN, STEVENS, and O'CONNOR, JJ., joined, and an opinion with respect to Parts II and IV, in which BLACKMUN, STEVENS, and O'CONNOR, JJ., joined. BURGER, C. J., concurred in the judgment. BRENNAN, J., filed an opinion concurring in part and dissenting in part, *post*, p. 38. MARSHALL, J., filed an opinion concurring in the judgment in part and dissenting in part, in which BRENNAN, J., joined, *post*, p. 45. POWELL, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 45.

*J. Lloyd Snook III*, by appointment of the Court, 471 U. S. 1134, argued the cause and filed briefs for petitioner.

*James E. Kulp*, Senior Assistant Attorney General of Virginia, argued the cause for respondent. With him on the brief were *William G. Broaddus*, Attorney General, and *Robert H. Anderson III*, Assistant Attorney General.

JUSTICE WHITE announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and III, and an opinion with respect to Parts II and IV, in which JUSTICE BLACKMUN, JUSTICE STEVENS, and JUSTICE O'CONNOR join.

Petitioner is a black man sentenced to death for the murder of a white storekeeper. The question presented is whether the trial judge committed reversible error at *voir dire* by refusing petitioner's request to question prospective jurors on racial prejudice.

I

On July 12, 1978, petitioner entered a jewelry store in Franklin, Virginia, armed with a sawed-off shotgun. He demanded that the proprietor, W. Jack Smith, Jr., put jewelry and money from the cash register into some jewelry bags. Smith complied with petitioner's demand, but triggered a

silent alarm, alerting the Police Department. When Alan Bain, a police officer, arrived to inquire about the alarm, petitioner surprised him and forced him to surrender his revolver.

Having learned that Smith had triggered a silent alarm, petitioner became agitated. He fired toward the rear wall of the store and stated that if he saw or heard any more police officers, he was going to start killing those in the store.[1] When a police siren sounded, petitioner walked to where Smith was stationed behind a counter and without warning shot him in the head with Bain's pistol, wounding Smith and causing him to slump incapacitated to the floor.

Officer Bain attempted to calm petitioner, promising to take him anywhere he wanted to go and asking him not to shoot again. Petitioner angrily replied that he was going to kill Smith for "snitching," and fired two pistol shots into Smith's chest, fatally wounding him. As petitioner turned away from shooting Smith, Bain was able to disarm him and place him under arrest.

A Southampton County, Virginia, grand jury indicted petitioner on charges of capital murder, use of a firearm in the commission of a murder, and possession of a sawed-off shotgun in the commission of a robbery. Petitioner requested and was granted a change of venue to Northampton County, Virginia, a rural county some 80 miles from the location of the murder.

Prior to the commencement of *voir dire*, petitioner's counsel submitted to the trial judge a list of proposed questions, including the following:

> "'The defendant, Willie Lloyd Turner, is a member of the Negro race. The victim, W. Jack Smith, Jr., was a white Caucasian. Will these facts prejudice you against Willie Lloyd Turner or affect your ability to render a fair

---

[1] In addition to Smith and Bain, a store employee and two customers were present at this time.

and impartial verdict based solely on the evidence?'" *Turner* v. *Commonwealth*, 221 Va. 513, 522, n. 8, 273 S. E. 2d 36, 42, n. 8 (1980).

The judge declined to ask this question, stating that it "has been ruled on by the Supreme Court."[2] App. 15. The judge did ask the venire, who were questioned in groups of five in petitioner's presence, whether any person was aware of any reason why he could not render a fair and impartial verdict, to which all answered "no." *Id.*, at 17, 78. At the time the question was asked, the prospective jurors had no way of knowing that the murder victim was white.

The jury that was empaneled, which consisted of eight whites and four blacks, convicted petitioner on all of the charges against him. *Id.*, at 97 and Addendum. After a separate sentencing hearing on the capital charge, the jury recommended that petitioner be sentenced to death, a recommendation the trial judge accepted. *Id.*, at 18, 19.

Petitioner appealed his death sentence to the Virginia Supreme Court. Among other points, he argued that the trial judge deprived him of his constitutional right to a fair and impartial jury by refusing to question prospective jurors on racial prejudice. The Virginia Supreme Court rejected this argument. Relying on our decision in *Ristaino* v. *Ross*, 424 U. S. 589 (1976), the court stated that a trial judge's refusal to ask prospective jurors about their racial attitudes, while perhaps not the wisest decision as a matter of policy, is not constitutionally objectionable in the absence of factors akin to those in *Ham* v. *South Carolina*, 409 U. S. 524 (1973).[3] *Turner* v. *Commonwealth*, *supra*, at 523, 273 S. E.

---

[2] Whether the trial judge was referring to this Court's decision in *Ristaino* v. *Ross*, 424 U. S. 589 (1976), or to a decision of the Virginia Supreme Court, is unclear.

[3] In *Ham*, a young black man known in his small South Carolina hometown as a civil rights activist was arrested and charged with possession of marijuana. We held that the trial judge committed reversible error in refusing to honor Ham's request to question prospective jurors on racial

2d, at 42. The court held that "[t]he mere fact that a defendant is black and that a victim is white does not constitutionally mandate . . . an inquiry [into racial prejudice]." *Ibid.*[4]

Having failed in his direct appeal, petitioner sought habeas corpus relief in the Federal District Court for the Eastern District of Virginia. App. 97. Again he argued without success that the trial judge's refusal to ask prospective jurors about their racial attitudes deprived him of his right to a fair trial. *Id.*, at 102–104. The District Court noted that in *Ristaino, supra,* which involved a crime of interracial violence,[5] we held that inquiry into racial prejudice at *voir dire* was not constitutionally required because the facts of the case "'did not suggest a significant likelihood that racial prejudice might infect [the defendant's] trial.'" App. 103 (quoting 424 U. S., at 598). The court found the present case like *Ristaino* and unlike *Ham* in that "racial issues [are] not 'inextricably bound up with the facts at trial.'" App. 103.

The United States Court of Appeals for the Fourth Circuit affirmed the District Court's denial of habeas corpus relief for

---

prejudice. In *Ristaino, supra,* we specified the factors which mandated an inquiry into racial prejudice in *Ham:*

"Ham's defense was that he had been framed because of his civil rights activities. His prominence in the community as a civil rights activist, if not already known to veniremen, inevitably would have been revealed to the members of the jury in the course of his presentation of that defense. Racial issues therefore were inextricably bound up with the conduct of the trial. Further, Ham's reputation as a civil rights activist and the defense he interposed were likely to intensify any prejudice that individual members of the jury might harbor." 424 U. S., at 596–597.

[4] The court also rejected petitioner's reliance on a statistical study showing that black defendants who kill white victims are sentenced to death with disproportionate frequency. The court stated that the study, which is based on statistics compiled in other States, has little utility in establishing the potential for racial prejudice in Virginia. 221 Va., at 523, n. 9, 273 S. E. 2d, at 42, n. 9.

[5] In *Ristaino,* the defendant was one of three black men charged with assaulting a white security guard with intent to murder him. The assault occurred in the course of a robbery. 424 U. S., at 590.

petitioner. *Turner* v. *Bass,* 753 F. 2d 342 (1985). Like the Virginia Supreme Court and the District Court, the Fourth Circuit found no "special circumstances" in this case analogous to those in *Ham.* The court rejected the idea that "the nature of the crime or punishment itself is . . . a special circumstance." 753 F. 2d, at 345. Relying on *Ristaino,* the court likewise found no special circumstance in the fact that petitioner is black and his victim white.[6]

We granted certiorari to review the Fourth Circuit's decision that petitioner was not constitutionally entitled to have potential jurors questioned concerning racial prejudice. 471 U. S. 1098 (1985). We reverse.

II

The Fourth Circuit's opinion correctly states the analytical framework for evaluating petitioner's argument: "The broad inquiry in each case must be . . . whether under all of the circumstances presented there was a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be indifferent as [they stand] unsworn." 753 F. 2d, at 345–346 (internal quotation omitted). The Fourth Circuit was correct, too, in holding that under *Ristaino* the mere fact that petitioner is black and his victim white does not constitute a "special circumstance" of constitutional proportions. What sets this case apart from *Ristaino,* however, is that in addition to petitioner's being accused of a crime against a white victim, the crime charged was a capital offense.

In a capital sentencing proceeding before a jury, the jury is called upon to make a "highly subjective, 'unique, individual-

---

[6] To the suggestion that it is a special circumstance that black murderers whose victims are white are executed with disproportionate frequency, the court responded by quoting our opinion in *Rosales-Lopez* v. *United States,* 451 U. S. 182 (1981), for the proposition that " '[t]here is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups.' " 753 F. 2d, at 345 (quoting 451 U. S., at 190).

ized judgment regarding the punishment that a particular person deserves.'" *Caldwell* v. *Mississippi*, 472 U. S. 320, 340, n. 7 (1985) (quoting *Zant* v. *Stephens*, 462 U. S. 862, 900 (1983) (REHNQUIST, J., concurring in judgment)). The Virginia statute under which petitioner was sentenced is instructive of the kinds of judgments a capital sentencing jury must make. First, in order to consider the death penalty, a Virginia jury must find either that the defendant is likely to commit future violent crimes or that his crime was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim." Va. Code § 19.2–264.2 (1983). Second, the jury must consider any mitigating evidence offered by the defendant. Mitigating evidence may include, but is not limited to, facts tending to show that the defendant acted under the influence of extreme emotional or mental disturbance, or that at the time of the crime the defendant's capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was significantly impaired." § 19.2–262.4(B). Finally, even if the jury has found an aggravating factor, and irrespective of whether mitigating evidence has been offered, the jury has discretion not to recommend the death sentence, in which case it may not be imposed. § 19.2–264.2.

Virginia's death-penalty statute gives the jury greater discretion than other systems which we have upheld against constitutional challenge. See, *e. g.*, *Jurek* v. *Texas*, 428 U. S. 262 (1976). However, our cases establish that every capital sentencer must be free to weigh relevant mitigating evidence before deciding whether to impose the death penalty, see, *e. g.*, *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982); *Lockett* v. *Ohio*, 438 U. S. 586, 597–609 (1978) (plurality opinion), and that in the end it is the jury that must make the difficult, individualized judgment as to whether the defendant deserves the sentence of death.

Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected. On the facts of this case, a juror who believes that blacks are violence prone or morally inferior might well be influenced by that belief in deciding whether petitioner's crime involved the aggravating factors specified under Virginia law. Such a juror might also be less favorably inclined toward petitioner's evidence of mental disturbance as a mitigating circumstance. More subtle, less consciously held racial attitudes could also influence a juror's decision in this case. Fear of blacks, which could easily be stirred up by the violent facts of petitioner's crime, might incline a juror to favor the death penalty.[7]

The risk of racial prejudice infecting a capital sentencing proceeding is especially serious in light of the complete finality of the death sentence. "The Court, as well as the separate opinions of a majority of the individual Justices, has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *California* v. *Ramos*, 463 U. S. 992, 998–999 (1983). We have struck down capital sentences when we found that the cir-

---

[7] In referring to the facts of petitioner's crime, we do not retreat from our holding in *Ristaino*. The fact of interracial violence alone is not a "special circumstance" entitling the defendant to have prospective jurors questioned about racial prejudice. It should be clear, though, that our holding in *Ristaino* was not based on a blind belief that the facts presented in that case could not evoke racial prejudice. As we stated in *Rosales-Lopez* v. *United States*, 451 U. S., at 192: "It remains an unfortunate fact in our society that violent crimes perpetrated against members of other racial or ethnic groups often raise [a reasonable possibility that racial prejudice would influence the jury]." *Ristaino* does not condone this possibility, but simply leaves it to the trial judge's discretion to decide what measures to take in screening out racial prejudice, absent a showing of "significant likelihood that racial prejudice might infect [the] trial." 424 U. S., at 598.

cumstances under which they were imposed "created an unacceptable risk that 'the death penalty [may have been] meted out arbitrarily or capriciously' or through 'whim . . . or mistake.'" *Caldwell, supra,* at 343 (O'CONNOR, J., concurring in part and concurring in judgment) (citation omitted). In the present case, we find the risk that racial prejudice may have infected petitioner's capital sentencing unacceptable in light of the ease with which that risk could have been minimized.[8] By refusing to question prospective jurors on racial prejudice, the trial judge failed to adequately protect petitioner's constitutional right to an impartial jury.[9]

## III

We hold that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the

---

[8] JUSTICE POWELL's dissent takes issue with what he terms the "singularly unwise and unjustified presumption that capital jurors harbor latent racial bias." *Post,* at 53. This remark fails to distinguish between our recognition that jurors in a capital case *may* harbor racial bias, and the presumption, which we do not make, that any particular capital jurors are in fact racially prejudiced. JUSTICE POWELL implicitly recognizes such a distinction, but only when it suits his purposes; thus, he does not say that in a case like *Ham v. South Carolina,* 409 U. S. 524 (1973), the jurors are presumed to be prejudiced, but rather that there is "an unacceptable risk that racial prejudice will 'distort the trial.'" *Post,* at 50.

Once rhetoric is put aside, it is plain that there is some risk of racial prejudice influencing a jury whenever there is a crime involving interracial violence, see n. 7, *supra;* the only question is at what point that risk becomes constitutionally unacceptable. Notwithstanding JUSTICE POWELL's attempt to minimize the significance of the discretion entrusted to the jury at a capital sentencing hearing, *post,* at 50–52, we are convinced that such discretion gives greater opportunity for racial prejudice to operate than is present when the jury is restricted to factfinding. This, together with the special seriousness with which we view the risk of racial prejudice influencing a capital sentencing decision, is what distinguishes this case from *Ristaino.*

[9] The right to an impartial jury is guaranteed by both the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, and by principles of due process. *Ristaino,* 424 U. S., at 595, n. 6.

race of the victim and questioned on the issue of racial bias.[10] The rule we propose is minimally intrusive; as in other cases involving "special circumstances," the trial judge retains discretion as to the form and number of questions on the subject, including the decision whether to question the venire individually or collectively. See *Ham* v. *South Carolina*, 409 U. S., at 527. Also, a defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry.

## IV

The inadequacy of *voir dire* in this case requires that petitioner's death sentence be vacated. It is not necessary, however, that he be retried on the issue of guilt. Our judgment in this case is that there was an unacceptable risk of racial prejudice infecting the *capital sentencing proceeding*. This judgment is based on a conjunction of three factors: the fact that the crime charged involved interracial violence, the broad discretion given the jury at the death-penalty hearing, and the special seriousness of the risk of improper sentencing in a capital case.[11] At the guilt phase of petitioner's trial, the jury had no greater discretion than it would have had if the crime charged had been noncapital murder. Thus, with respect to the guilt phase of petitioner's trial, we find this case

---

[10] JUSTICE POWELL contends that inquiry into racial prejudice "in the absence of circumstances that make clear a need for it could well have the negative effect of suggesting to the jurors that race somehow is relevant to the case." *Post*, at 48–49, n. 5. Whether such a concern is purely chimerical or not is a decision we leave up to a capital defendant's counsel. Should defendant's counsel decline to request *voir dire* on the subject of racial prejudice, we in no way require or suggest that the judge broach the topic *sua sponte*.

[11] We find it unnecessary to evaluate the statistical studies which petitioner has introduced in support of the proposition that black defendants who kill whites are executed with disproportionate frequency.

to be indistinguishable from *Ristaino,* to which we continue to adhere.[12]   See n. 5, *supra.*

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

THE CHIEF JUSTICE concurs in the judgment.

JUSTICE BRENNAN, concurring in part and dissenting in part.

The Court's judgment vacates petitioner's sentence of death while refusing to disturb his conviction.   Adhering to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg* v. *Georgia,* 428 U. S. 153, 227 (1976) (BRENNAN, J., dissenting), I agree that the death sentence in this case must be vacated.   But even if I did not hold that view, I would still find that the sentence was unconstitutionally imposed in this case.   In my view, the constitutional right of a defendant to have a trial judge ask the members

---

[12] JUSTICE BRENNAN incorrectly reads into our opinion a suggestion that "the constitutional entitlement to an impartial jury attaches only at the sentencing phase." *Post,* at 43.   The real question is not whether there is a constitutional right to an impartial jury throughout a criminal trial, see n. 9, *supra,* but what prophylactic rules the Constitution imposes on the States in furtherance of that right.   What we held in *Ristaino,* and reaffirm today, is that absent "special circumstances" that create a particularly compelling need to inquire into racial prejudice, the Constitution leaves the conduct of *voir dire* to the sound discretion of state trial judges.

The implication of JUSTICE BRENNAN's opinion is that every crime of interracial violence is a "special circumstance."   Over JUSTICE BRENNAN's dissent, however, *Ristaino* squarely rejected this approach.   Moreover, we are unpersuaded by JUSTICE BRENNAN's view that "the opportunity for racial bias to taint the jury process is . . . equally a factor at the guilt [and sentencing] phase[s] of a bifurcated capital trial." *Post,* at 41.   As we see it, the risk of racial bias at sentencing hearings is of an entirely different order, because the decisions that sentencing jurors must make involve far more subjective judgments than when they are deciding guilt or innocence.

of the venire questions concerning possible racial bias is triggered whenever a violent interracial crime has been committed. See *Ross* v. *Massachusetts*, 414 U. S. 1080 (1973) (MARSHALL, J., dissenting from denial of certiorari). The reality of race relations in this country is such that we simply may not presume impartiality, and the risk of bias runs especially high when members of a community serving on a jury are to be confronted with disturbing evidence of criminal conduct that is often terrifying and abhorrent. In analyzing the question of when the Constitution requires trial judges to accommodate defendants' requests for inquiries into racial prejudice, I, like the Court, am influenced by what the Court correctly describes as the "ease" with which the risk may be minimized. *Ante*, at 36.

In any event, I cannot fully join either the Court's judgment or opinion. For in my view, the decision in this case, although clearly half right, is even more clearly half wrong. After recognizing that the constitutional guarantee of an impartial jury entitles a defendant in a capital case involving interracial violence to have prospective jurors questioned on the issue of racial bias—a holding which requires that this case be reversed and remanded for new sentencing—the Court disavows the logic of its own reasoning in denying petitioner Turner a new trial on the issue of his guilt. It accomplishes this by postulating a jury role at the sentencing phase of a capital trial fundamentally different from the jury function at the guilt phase and by concluding that the former gives rise to a significantly greater risk of a verdict tainted by racism. Because I believe that the Court's analysis improperly intertwines the significance of the *risk* of bias with the *consequences* of bias, and because in my view the distinction between the jury's role at a guilt trial and its role at a sentencing hearing is a distinction without substance in so far as juror bias is concerned, I join only that portion of the Court's judgment granting petitioner a new sentencing pro-

ceeding, but dissent from that portion of the judgment refusing to vacate the conviction.

The Sixth Amendment guarantees criminal defendants an impartial jury. This is not mere exhortation for it has been noted that "the right to an impartial jury carries with it the concomitant right to take reasonable steps designed to insure that the jury is impartial." *Ham* v. *South Carolina*, 409 U. S. 524, 532 (1973) (MARSHALL, J. concurring in part and dissenting in part). Among the most important of the means designed to insure an impartial jury is the right to strike those jurors who manifest an inability to try the case solely on the basis of the evidence. This right to exclude incompetent jurors cannot be exercised meaningfully or effectively unless counsel has sufficient information with which to evaluate members of the venire. As JUSTICE WHITE noted for the Court in *Rosales-Lopez* v. *United States*, 451 U. S. 182, 188 (1981), "lack of adequate *voir dire* impairs the defendant's right to exercise peremptory challenges where provided by statute or rule, as it is in the federal courts" (footnote omitted).

Recognizing this fact, we held long ago that "essential demands of fairness" may require a judge to ask jurors whether they entertain any racial prejudice. *Aldridge* v. *United States*, 283 U. S. 308 (1931); see also *Ham* v. *South Carolina*. More recently, we attempted to refine the analysis, and declared that when there is a showing of a "likelihood" that racial or ethnic prejudice may affect the jurors, the Constitution requires a trial judge to honor a defendant's request to examine the jurors' ability to deal impartially with the evidence adduced at trial. *Rosales-Lopez, supra* at 190. Exercising our supervisory powers over the federal courts, we held in *Rosales-Lopez* that when a violent crime has been committed, and the victim and the accused are of different races, a *per se* inference of a "reasonable possibility" of prejudice is shown. In the present case, we deal with a criminal case from a state court involving an act of interracial vio-

lence, and are faced with the question of what factors and circumstances will elevate this presumptive "reasonable possibility" of prejudice into a constitutionally significant "likelihood" of prejudice.

The Court identifies three factors, the "conjunction" of which in its view entitled petitioner Turner as a matter of constitutional right to have the jury questioned on racial bias. These are (1) the fact that the crime committed involved interracial violence; (2) the broad discretion given the jury at the death penalty hearing; and (3) the "special seriousness of the risk of improper sentencing in a capital case." *Ante,* at 37. I agree with the Court that when these three factors are present, as they were at petitioner's sentencing hearing, the trial court commits constitutional error in refusing a defense request to ask the jurors if the race of either the victim or the accused will bear on their ability to render a decision based solely on the evidence. What I cannot accept is that the judge is released from this obligation to insure an impartial jury—or, to put it another way, that the defendant is stripped of this constitutional safeguard—when a capital jury is hearing evidence concerning a crime involving interracial violence but passing "only" on the issue of guilt/innocence, rather than on the appropriate sentence.

The Court's argument is simply untenable on its face. As best I can understand it, the thesis is that since there is greater discretion entrusted to a capital jury in the sentencing phase than in the guilt phase, "there is [in the sentencing hearing] a unique opportunity for racial prejudice to operate but remain undetected." *Ante,* at 35. However, the Court's own discussion of the issues demonstrates that the opportunity for racial bias to taint the jury process is not "uniquely" present at a sentencing hearing, but is equally a factor at the guilt phase of a bifurcated capital trial.

According to the Court, a prejudiced juror sitting at a sentencing hearing might be influenced by his racial bias in deciding whether the crime committed involved aggravating

factors specified under state law; the Court notes that racial prejudice might similarly cause that juror to be less favorably inclined toward an accused's evidence of mitigating circumstances. Moreover, the Court informs us:

> "More subtle, less consciously held racial attitudes could also influence a juror's decision. . . . Fear of blacks, which could easily be stirred up by the violent facts of [a] crime, might incline a juror to favor the death penalty." *Ibid.*

The flaw in this "analysis" is that there is simply no connection between the proposition advanced, the support proffered for that thesis, and the conclusion drawn. In other words, it is certainly true, as the Court maintains, that racial bias inclines one to disbelieve and disfavor the object of the prejudice, and it is similarly incontestable that subconscious, as well as express, racial fears and hatreds operate to deny fairness to the person despised; that is why we seek to insure that the right to an impartial jury is a meaningful right by providing the defense with the opportunity to ask prospective jurors questions designed to expose even hidden prejudices. But the Court never explains why these biases should be of less concern at the guilt phase than at the sentencing phase. The majority asserts that "a juror who believes that blacks are violence prone or morally inferior might well be influenced by that belief in deciding whether petitioner's crime involved the aggravating factors specified under Virginia law." *Ibid.* But might not that same juror be influenced by those same prejudices in deciding whether, for example, to credit or discredit white witnesses as opposed to black witnesses at the guilt phase? Might not those same racial fears that would incline a juror to favor death not also incline a juror to favor conviction?

A trial to determine guilt or innocence is, at bottom, nothing more than the sum total of a countless number of small discretionary decisions made by each individual who sits in the jury box. The difference between conviction and acquit-

tal turns on whether key testimony is believed or rejected; on whether an alibi sounds plausible or dubious; on whether a character witness appears trustworthy or unsavory; and on whether the jury concludes that the defendant had a motive, the inclination, or the means available to commit the crime charged. A racially biased juror sits with blurred vision and impaired sensibilities and is incapable of fairly making the myriad decisions that each juror is called upon to make in the course of a trial. To put it simply, he cannot judge because he has prejudged. This is equally true at the trial on guilt as at the hearing on sentencing.

To sentence an individual to death on the basis of a proceeding tainted by racial bias would violate the most basic values of our criminal justice system. This the Court understands. But what it seems not to comprehend is that to permit an individual to be *convicted* by a prejudiced jury violates those same values in precisely the same way. The incongruity of the Court's split judgment is made apparent after it is appreciated that the opportunity for bias to poison decision-making operates at a guilt trial in the same way as it does at a sentencing hearing and after one returns to the context of the case before us. Implicit in the Court's judgment is the acknowledgment that there was a likelihood that the jury that pronounced the death sentence acted, in part, on the basis of racial prejudice. But the exact same jury convicted Turner. Does the Court really mean to suggest that the constitutional entitlement to an impartial jury attaches only at the sentencing phase? Does the Court really believe that racial biases are turned on and off in the course of one criminal prosecution?

My sense is that the Court has confused the *consequences* of an unfair trial with the *risk* that a jury is acting on the basis of prejudice. In other words, I suspect that what is really animating the Court's judgment is the sense of outrage it rightly experiences at the prospect of a man being sentenced to death on the basis of the color of his skin. Perhaps

the Court is slightly less troubled by the prospect of a racially motivated conviction unaccompanied by the death penalty, and I suppose that if, for some unimaginable reason, I had to choose between the two cases, and could only rectify one, I would remedy the case where death had been imposed. But there is no need to choose between the two cases. To state what seems to me obvious, the constitutional right implicated is the right to be judged by an impartial jury, regardless of the sentence, and the constitutional focus thus belongs on whether there is a likelihood of bias, and not on what flows from that bias. In *Ham* v. *South Carolina*, 409 U. S. 524 (1973), we reversed the conviction of a young black man who was charged with and convicted of possession of marijuana; because the man was known in the community as a civil rights activist, and because we were persuaded that racial issues were inextricably bound up with the conduct of the trial, we concluded that it was likely that any prejudice that individual members of the jury might harbor would be intensified and held that under those circumstances the trial judge was required to oblige the defense request to inquire into the jury's possible racial bias. We did not reject the petitioner's claim in that case because he was sentenced only to 18 months' imprisonment. Surely one has a right to an impartial jury whether one is subject to punishment for a day or a lifetime.

The Court may believe that it is being Solomonic in "splitting the difference" in this case and granting petitioner a new sentencing hearing while denying him the other "half" of the relief demanded. Starkly put, petitioner "wins" in that he gets to be resentenced, while the State "wins" in that it does not lose its conviction. But King Solomon did not, in fact, split the baby in two, and had he done so, I suspect that he would be remembered less for his wisdom than for his hardheartedness. Justice is not served by compromising principles in this way. I would reverse the conviction as well as the sentence in this case to insure compliance with the constitutional guarantee of an impartial jury.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, concurring in the judgment in part and dissenting in part.

For the reasons stated in my opinion in *Ross* v. *Massachusetts*, 414 U. S. 1080 (1973) (dissenting from denial of certiorari), I believe that a criminal defendant is entitled to inquire on *voir dire* about the potential racial bias of jurors whenever the case involves a violent interracial crime. As the Court concedes, "it is plain that there is some risk of racial prejudice influencing a jury whenever there is a crime involving interracial violence." *Ante*, at 36, n. 8. To my mind that risk plainly outweighs the slight cost of allowing the defendant to choose whether to make an inquiry concerning such possible prejudice. This Court did not identify in *Ristaino* v. *Ross*, 424 U. S. 589 (1976), nor does it identify today, any additional burdens that would accompany such a rule. I therefore cannot agree with the Court's continuing rejection of the simple prophylactic rule proposed in *Ristaino*.

Even if I agreed with the Court that a *per se* rule permitting inquiry into racial bias is appropriate only in capital cases, I could not accept the Court's failure to remedy the denial of such inquiry in this capital case by reversing petitioner's conviction. Henceforth any capital defendant accused of an interracial crime may inquire into racial prejudice on *voir dire*. When, as here, the same jury sits at the guilt phase and the penalty phase, these defendants will be assured an impartial jury at both phases. Yet petitioner is forced to accept a conviction by what may have been a biased jury. This is an incongruous and fundamentally unfair result. I therefore concur only in the Court's judgment vacating petitioner's sentence, and dissent from the Court's refusal to reverse the conviction as well.

JUSTICE POWELL, with whom JUSTICE REHNQUIST joins, dissenting.

The Court today adopts a *per se* rule applicable in capital cases, under which "a capital defendant accused of an interra-

cial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." *Ante,* at 36–37. This rule is certain to add to the already heavy burden of habeas petitions filed by prisoners under sentence of death[1] without affording any real protection beyond that provided by our decisions in *Ham* v. *South Carolina,* 409 U. S. 524 (1973), and *Ristaino* v. *Ross,* 424 U. S. 589 (1976).

In effect, the Court recognizes a presumption that jurors who have sworn to decide the case impartially nevertheless are racially biased. Such a presumption is flatly contrary to our decisions in *Ristaino* v. *Ross, supra,* and *Rosales-Lopez* v. *United States,* 451 U. S. 182, 190 (1981).[2] The facts of

---

[1] This case has traveled through each layer of review provided to capital defendants in our state and federal systems. On July 12, 1978, petitioner committed the murder underlying this petition. Trial commenced on December 3, 1979, and the jury convicted petitioner on capital murder and other charges on December 4, 1979. Following the jury's recommendation, the trial judge sentenced petitioner to death on February 6, 1980. The Supreme Court of Virginia affirmed the convictions and sentences. *Turner* v. *Commonwealth,* 221 Va. 513, 273 S. E. 2d 36 (1980). This Court denied a petition for a writ of certiorari. 451 U. S. 1011 (1981). Petitioner then filed a petition for a writ of habeas corpus in the Circuit Court for the County of Southampton. That court denied relief, and the Supreme Court of Virginia denied review. We denied a petition for a writ of certiorari. *Turner* v. *Morris,* 462 U. S. 1112 (1983). Then, petitioner filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Virginia. By order entered May 23, 1984, the District Court denied the writ. The Court of Appeals for the Fourth Circuit affirmed. *Turner* v. *Bass,* 753 F. 2d 342 (1985). This Court granted certiorari, 471 U. S. 1096 (1985), and today reverses.

[2] "Although *Ristaino* involved an alleged criminal confrontation between a black assailant and a white victim, that fact pattern alone did not create a need of 'constitutional dimensions' to question the jury concerning racial prejudice. 424 U. S., at 596, 597. There is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups. As *Ristaino* demonstrates, there is no *per se* constitutional rule in such circumstances requiring inquiry as to racial prejudice. *Id.,* at 596, n. 8. Only when there are more substantial indications of the likeli-

this case demonstrate why it is unnecessary and unwise for this Court to rule, as a matter of constitutional law, that a trial judge *always* must inquire into racial bias in a capital case involving an interracial murder, rather than leaving that decision to be made on a case-by-case basis.[3] Before today the facts that a defendant is black and his victim was white were insufficient to raise "a constitutionally significant likelihood that, absent questioning about racial prejudice," an impartial jury would not be seated. *Ristaino* v. *Ross, supra,* at 596.

I

Nothing in this record suggests that racial bias played any role in the jurors' deliberations. The relevant circumstances merit emphasis because they demonstrate that the fact of an interracial murder, by itself, does not create a substantial likelihood that racial issues can be expected to distort capital sentencing trials. Without further evidence that race can be expected to be a factor in such trials, there is no justification for departing from the rule of *Ham* and *Ristaino*.

Petitioner committed murder in the course of an armed robbery of a jewelry store in Franklin, Virginia. The murder was brutal. Petitioner shot the store's proprietor three

hood of racial or ethnic prejudice affecting the jurors in a particular case does the trial court's denial of a defendant's request to examine the jurors' ability to deal impartially with this subject amount to an unconstitutional abuse of discretion." *Rosales-Lopez* v. *United States,* 451 U. S., at 190 (plurality opinion). Although JUSTICE WHITE's opinion in *Rosales-Lopez* was for a plurality, JUSTICE REHNQUIST's opinion concurring in the result was entirely consistent with the foregoing language.

[3] "Despite its importance, the adequacy of *voir dire* is not easily subject to appellate review. The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions. See *Ristaino* v. *Ross,* 424 U. S. 589, 595 (1976), quoting *Rideau* v. *Louisiana,* 373 U. S. 723, 733 (1963) (Clark, J., dissenting). In neither instance can an appellate court easily second-guess the conclusions of the decisionmaker who heard and observed the witnesses." *Id.,* at 188.

times. The first shot did not kill, but caused the victim to fall helplessly to the floor, bleeding from a scalp wound. A police officer, who had arrived in answer to a silent alarm, pleaded with petitioner not to shoot again. But petitioner fired two more shots into his victim's chest, causing his death. The officer then managed to subdue and arrest petitioner. At trial, the evidence of petitioner's guilt was conclusive.[4] Because the local media gave the murder extensive publicity, petitioner requested and was granted a change of venue from Southampton County to Northampton County, across the Chesapeake Bay, some 80 miles away from the location of the murder. No member of the jury empaneled had read or heard about the murder.

Virginia law vests the trial judge with the responsibility to conduct *voir dire* examination of prospective jurors. *Turner* v. *Commonwealth*, 221 Va. 513, 519–522, 273 S. E. 2d 36, 40–42 (1980), cert. denied, 451 U. S. 1011 (1981). Ordinarily, the judge, rather than counsel, questions members of the venire to provide a basis for the exercise of challenges. In this case, in accordance with state practice, the judge permitted the parties to propose questions to be asked during *voir dire*. Counsel for petitioner submitted 15 questions. As the 10th question on his list, counsel requested the following:

> "'The defendant, Willie Lloyd Turner, is a member of the Negro race. The victim, W. Jack Smith, Jr., was a white Caucasian. Will those facts prejudice you against Willie Lloyd Turner or affect your ability to render a fair and impartial verdict based solely on the evidence?'" *Id.*, at 522, n. 8, 273 S. E. 2d, at 42, n. 8.[5]

---

[4] At oral argument, counsel for petitioner conceded that there was no question as to his client's guilt. Tr. of Oral Arg. 47.

[5] In the event that the Court decides that this new rule is to be applied prospectively only, the result of this decision will be to require trial judges to ask prospective jurors this simplistic question on *voir dire*. Asking such a question in the absence of circumstances that make clear a need for

As support for this proposed question, petitioner's counsel referred only to certain studies that were subsequently placed in the record.   The studies purported to show that a black defendant who murders a white person is more likely to receive the death penalty than other capital defendants, but the studies included no statistics concerning administration of the death penalty in Virginia.   See *Turner* v. *Commonwealth, supra,* at 523, n. 9, 273 S. E. 2d, at 42, n. 9.   Counsel then discussed their proposed questions with the judge. The prosecutor pointed out that the case presented no racial issues beyond the fact that petitioner and his victim were of different races.

The trial judge declined to ask the proposed question, but he did ask general questions designed to uncover bias.   For example, the prospective jurors were asked, "Do any of you know any reason whatsoever why you cannot render a fair and impartial verdict in this case, either for the defendant or for the Commonwealth of Virginia?"   Each juror responded negatively.[6]   The jury of 12 persons ultimately empaneled included 4 black citizens, and a black juror was selected to act as foreman.

There is nothing in the record of this trial that reflects racial overtones of any kind.   From *voir dire* through the close of trial, no circumstance suggests that the trial judge's refusal to inquire particularly into racial bias posed "an impermissible threat to the fair trial guaranteed by due process." *Ristaino* v. *Ross,* 424 U. S., at 595.   The Court does not purport to identify any such circumstance, or to explain why the facts that a capital defendant is of one race and his victim of

it could well have the negative effect of suggesting to the jurors that race somehow is relevant to the case.

[6] As the facts of *Ristaino* v. *Ross* demonstrate, such a general question can prompt a juror who is aware of the defendant's race, as the jurors were in this case, to admit to racial bias.   424 U. S., at 593, and n. 5.   This general inquiry into bias does not have the undesirable result of suggesting to the jurors that race is relevant to the issues in the case.

another now create a significant likelihood that racial issues will distort the jurors' consideration of the issues in the trial. *Id.*, at 597. This case illustrates that it is unnecessary for the Court to adopt a *per se* rule that constitutionalizes the unjustifiable presumption that jurors are racially biased.

## II

Until today a trial judge committed an unconstitutional abuse of discretion by refusing to inquire into racial prejudice only when the defendant showed that racial issues "were inextricably bound up with the conduct of the trial."[7] *Ristaino* v. *Ross*, 424 U. S., at 597. When a defendant makes such a showing, there is an unacceptable risk that racial prejudice will "distort the trial." *Ibid.* Under such circumstances, therefore, due process requires "a *voir dire* that include[s] questioning specifically directed to racial prejudice." *Ibid.; Ham* v. *South Carolina*, 409 U. S., at 526–527. In *Ristaino*, however, the Court expressly declined to adopt a *per se* rule requiring *voir dire* inquiry into racial bias in every trial for an interracial crime. Neither the Constitution nor sound policy considerations supported such a *per se* approach.[8] But today the Court decides that the Constitution does require a *per se* rule in capital cases because the

---

[7] The circumstances of *Ham* v. *South Carolina*, 409 U. S. 524 (1973), are illustrative. There, a black defendant was tried for possession of marijuana. The defendant was well known in the community where the case was tried for his civil rights activities, and the theory of his defense was that the police had framed him in retaliation for those activities. On those facts, the Court held that it was an unconstitutional abuse of discretion for the judge to refuse to inquire into racial prejudice. Not only were racial issues a central part of the trial, but also the defendant's "reputation as a civil rights activist and the defense he interposed were likely to intensify any prejudice that individual members of the jury might harbor." *Ristaino* v. *Ross*, 424 U. S., at 597.

[8] "In our heterogeneous society policy as well as constitutional considerations militate against the divisive assumption—as a *per se* rule—that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or the choice of religion." *Id.*, at 596, n. 8.

capital jury exercises discretion at the sentencing phase. The Court's reasoning ignores the many procedural and substantive safeguards, similar to those governing the jury's decision on guilt or innocence, that circumscribe the capital jury's sentencing decision.

Under Virginia law, murder is a capital offense only if it is "willful, deliberate and premeditated" and is committed while the perpetrator is engaged in another crime or under specified aggravating circumstances. Va. Code § 18.2-31 (Supp. 1985). As in any criminal prosecution, of course, the State carries the burden of proving all elements of the capital offense beyond a reasonable doubt. Following a sentencing hearing, the death sentence may not be imposed unless the State proves beyond a reasonable doubt statutorily defined aggravating factors. Virginia law recognizes only two aggravating factors: whether, based on the defendant's criminal record, there is a probability that he would commit future crimes of violence, and whether the defendant's crime was "outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim."[9] Va. Code §§ 19.2-264.2, 19.2-264.4 (1983). The jury also is required to consider any relevant mitigating evidence offered by the defendant.

The existence of these significant limitations on the jury's exercise of sentencing discretion illustrates why the Court's *per se* rule is wholly unfounded. Just as the trial judge's

---

[9] The Supreme Court of Virginia properly has given the "vileness" clause a limiting construction to ensure that the jury's discretion in recommending capital punishment is channeled by appropriate standards. See *Godfrey* v. *Georgia*, 446 U. S. 420 (1980). Sentence of death may be imposed on the basis of this aggravating factor only if the State makes a two-pronged showing. First, the State must prove beyond a reasonable doubt that the defendant's conduct was " 'outrageously or wantonly vile, horrible or inhuman.' " *Turner* v. *Commonwealth*, 221 Va., at 526, 273 S. E. 2d, at 44–45. Second, the State must prove beyond a reasonable doubt "torture of the victim, an aggravated battery of the victim, or the perpetrator's depravity of mind." *Id.*, at 526, 273 S. E. 2d, at 45.

charge at the guilt phase instructs the jurors that they may consider only the evidence in the case and that they must determine if the prosecution has established each element of the crime beyond a reasonable doubt, the charge at the penalty phase directs the jurors to focus solely on considerations relevant to determination of appropriate punishment and to decide if the prosecution has established beyond a reasonable doubt factors warranting imposition of death. Accordingly, just as there is no reason to presume racial bias on the part of jurors who determine the guilt of a defendant who has committed a violent crime against a person of another race, there is no reason to constitutionalize such a presumption with respect to the jurors who sit to recommend the penalty in a capital case.

Nor does anything in the circumstances of this jury's recommendation of the death penalty suggest a likelihood that sentencing decisions are being made on racial grounds so as to justify adoption of a *per se* rule. There is no question that the State proved the existence of the first aggravating factor beyond a reasonable doubt. As the Supreme Court of Virginia noted, since 1974 petitioner "has been convicted of malicious maiming, escape, unlawful wounding, malicious wounding, and second-degree murder. Four of these offenses occurred in the penal system." *Turner* v. *Commonwealth*, 221 Va., at 525, n. 11, 273 S. E. 2d, at 44, n. 11. The court also expressly found that petitioner's criminal record was "one of the most extensive" it had reviewed in a capital case. *Id.*, at 531, 273 S. E. 2d, at 47. The court further observed that, although the first aggravating factor plainly supported the recommendation of death, the circumstances of this crime were "vile" because petitioner had committed an aggravated battery on his victim. *Id.*, at 527, 273 S. E. 2d, at 45.

Under the foregoing circumstances, there is no basis for concluding that the jury's sentencing decision was tainted by racial bias. The mere fact that the sentencing decision, after

the jury had found guilt and the existence of aggravating factors beyond a reasonable doubt, involved an element of discretion provides no ground for this Court to presume that the decision was infected by racial prejudice. Instead, the rule that until today afforded due process required petitioner to establish that some special circumstances in *his* case, beyond the fact of an interracial crime, raised a constitutionally significant likelihood that racial prejudice would taint the proceedings. *Ristaino* v. *Ross*, 424 U. S., at 596. The Court rejects that rule, and adopts a singularly unwise and unjustified presumption that capital jurors harbor latent racial bias.

## III

The *per se* rule announced today may appear innocuous. But the rule is based on what amounts to a constitutional presumption that jurors in capital cases are racially biased. Such presumption unjustifiably suggests that criminal justice in our courts of law is meted out on racial grounds. It is not easy to reconcile the Court's holding today with the principles announced and applied in *Ham* v. *South Carolina*, *Ristaino* v. *Ross*, and *Rosales-Lopez* v. *United States*.[10] The manner in which petitioner was tried and sentenced, and particularly the jurors who fulfilled their civic duty to sit in his case, reflected not a trace of the racial prejudice that the Court's new rule now presumes.

For these reasons, I dissent.

---

[10] The Court's opinion purports to reaffirm *Ristaino* v. *Ross*, *ante*, at 35, n. 7, and would distinguish all three of the above-cited decisions on the ground that none of them was a capital case. The decision today cannot be reconciled with the reasoning of *Ristaino* and *Rosales-Lopez* in which we expressly held that the Constitution does not require *voir dire* questioning on racial bias unless the defendant proves additional circumstances beyond the fact that the case involves an interracial crime. Moreover, those two cases rejected any constitutional presumption that jurors are racially biased.