Walter **FEDDIMAN**, Defendant
below, Appellant,

v.

**STATE of Delaware**, Plaintiff
below, Appellee.

Supreme Court of Delaware.

Submitted: Nov. 9, 1988.
Decided: Feb. 22, 1989.

[redacted]

———

Upon appeal from the Superior Court. AFFIRMED.

Karl Haller (argued), and Howard W. Hudson, Jr., Haller and Hudson, Georgetown, for appellant.

M. Jane Brady, Deputy Atty. Gen., Georgetown, for appellee.

Before CHRISTIE, C.J., WALSH and HOLLAND, JJ.

HOLLAND, Justice.

The defendant-appellant, Walter Thomas Feddiman ("Feddiman"), was tried before a jury in the Superior Court, in and for Sussex County, on April 13 and 14, 1988. The charges against Feddiman were set forth in a twelve-count indictment. Feddiman was convicted of Reckless Endangering in the Second Degree [1]; Assault in the Third Degree, Kidnapping in the First Degree, Reckless Endangering in the First Degree [2], and eight counts of Unlawful Sexual Intercourse in the First Degree. Feddiman received nine life sentences, one for each conviction of Unlawful Sexual Intercourse in the First Degree, and one life sentence for the conviction of Kidnapping in the First Degree. He was also sentenced to be imprisoned for periods of ten years for Reckless Endangering in the First Degree, one year for Assault in the Third Degree, and one year for Reckless Endangering in the Second Degree. All of the sentences were to be served by Feddiman consecutively.

Feddiman was convicted as a result of actions which occurred when he knocked the victim off of her bicycle and took her away in his automobile to two separate locations. During the course of transporting the victim, and at each location, Feddiman forced the victim to engage in various acts of sexual intercourse. In this appeal, Feddiman challenges his convictions on several grounds. He contends that: 1) there was error in the jury selection process because the *voir dire* questions did not sufficiently address the issue of racial prejudice; 2) the State allegedly used peremptory challenges improperly to eliminate black people from the jury; 3) the Superior Court erred when it declined to grant Feddiman's motion to dismiss various counts of unlawful sexual intercourse on the grounds of multiplicity; 4) the Superior Court erred in allowing the State to distribute twelve copies of a transcript of his tape-recorded statement to the jury, without admitting the transcript into evidence; and 5) the Superior Court erred in not giving an instruction to the jury, as requested by his defense counsel, which distinguished a "separate" act of unlawful sexual intercourse from a "continuing" act of unlawful sexual intercourse.

1. Feddiman was convicted of Reckless Endangering in the Second Degree which was a lesser-included offense to the original charge of Reckless Endangering in the First Degree.

2. Feddiman was acquitted of Attempted Murder in the First Degree but convicted of the lesser-included offense of Reckless Endangering in the First Degree.

We find no merit in any of the issues presented by Feddiman. Therefore, all of the judgments of the Superior Court, resulting in Feddiman's convictions, are affirmed.

### Facts

The State's case against Feddiman was presented primarily through the testimony of the victim, who recounted the events which transpired between 2:00 a.m. and 8:00 a.m. on the morning of August 23, 1987. At approximately 2:15 a.m., the victim was riding her bicycle west on Route 54 in Fenwick Island, Sussex County, Delaware. Feddiman was traveling on Route 54 in his car when he swerved his vehicle and struck the victim's bicycle twice, knocking her from the bicycle and into a water-filled ditch.[3] Feddiman got out of his car wearing only a hat, shoes, socks and glasses. He struck the victim in the face several times while she was in the ditch.[4] He told the victim that if she did not get into his car, he would kill her. The victim got into the car.[5]

In the car, Feddiman ordered the victim to remove her clothes and forced her to engage in oral sexual intercourse (fellatio)[6] while he was driving the vehicle.[7] Feddiman stopped the car at a sandy beach area near the water. While still in the car, Feddiman forced the victim to engage in vaginal sexual intercourse.[8] He then forced her to engage in fellatio again.[9] While he was forcing her to commit fellatio, the victim threw up on Feddiman.

Feddiman pushed the victim out of the car and took her toward the water. He forced the victim to her knees on the sand near the water and demanded that she commit fellatio.[10] When the victim threw up on Feddiman again, he shoved her into the water. He pushed her head under the water a number of times.[11] The victim thought that Feddiman was going to drown her. The victim recalled gasping for breath when Feddiman pulled her out of the water by the hair. Feddiman took the victim back to the car. After she was inside of the car, he again forced her to engage in vaginal sexual intercourse.[12]

Feddiman then left the beach area in his car, with the victim, and drove for approximately fifteen minutes. Feddiman stopped the car in an overgrown area that had once been a "dump" site. In the car, Feddiman forced the victim, who was on her knees, to engage in vaginal sexual intercourse from the rear.[13] Feddiman then made the victim walk from the car to the edge of a pit. Feddiman then took the victim back to the car. Once again, he forced her to commit fellatio.[14] Feddiman then removed the victim from the car and again forced her to engage in vaginal sexual intercourse from

---

3. Count 1—Reckless Endangering in the First Degree.

4. Count 2—Assault in the Third Degree.

5. Count 3—Kidnapping in the First Degree.

6. "Sexual intercourse" is now defined as:
 (1) Any act of physical union of the genitalia or anus of 1 person with the mouth, anus or genitalia of another person. It occurs upon any penetration however slight. Ejaculation is not required. This offense encompasses the crimes commonly known as rape and sodomy; or
 (2) Any act of cunnilingus or fellatio regardless of whether penetration occurs. Ejaculation is not required.
 11 *Del.C.* § 761(e) (1987 & Supp.1988). Fellatio "means any oral contact with the male genitalia." 11 *Del.C.* 761(b) (1987).

7. Count 4—Unlawful Sexual Intercourse in the First Degree.

8. Count 7—Unlawful Sexual Intercourse in the First Degree.

9. Count 5—Unlawful Sexual Intercourse in the First Degree.

10. Count 6—Unlawful Sexual Intercourse in the First Degree.

11. Count 8—Attempted Murder in the First Degree.

12. Count 9—Unlawful Sexual Intercourse in the First Degree.

13. Count 10—Unlawful Sexual Intercourse in the First Degree.

14. Count 11—Unlawful Sexual Intercourse in the First Degree.

the rear.[15] Thereafter, Feddiman ordered the victim to put her clothes back on.

The victim eventually persuaded Feddiman to take her back to Route 54 and to release her. The victim walked home, arriving at approximately 8:00 a.m. on August 23, 1987. She locked herself in her home and spent the day crying. When it became dark, she became anxious and left her home to find her boyfriend.

The victim's boyfriend took her to a security guard and told him what had happened. The security guard called the police. The victim provided the police with information regarding her assailant's description, his motor vehicle, and a possible place of employment. Based upon that information, the police assembled a photographic lineup from which the victim identified Feddiman.

Feddiman was apprehended and gave a statement to the police which was tape-recorded. In the tape-recorded statement, Feddiman admitted that he was the individual that had been with the victim on the date of the offense. In the tape-recorded statement, Feddiman told the police that he was driving his car when he passed the victim, who was riding her bicycle. He stated that he then went down the road and took off his clothes. He returned and "bumped" the victim off of her bicycle with his car. He stated he hit her with his hand "about once," after she had fallen into a ditch beside the road.

In the tape-recorded statement, Feddiman also told the police that he took the victim to Sandy Cove (the beach area) and ordered her to go into the water. He stated that he told the victim "he might drown her," if she didn't do what he said. He also stated he told her to "do this and do that." He said he then took her to a wooded place near Frankford (the dump site), where he "told her to do these things again." He then told her to put her clothes on and took her back to the place where he had picked her up. When asked by the police officer to say what things he made her do, he stated "I can't describe that, I'm sorry I done it, I can't."

Feddiman testified in his own defense at trial. Feddiman denied giving the police the tape-recorded statement that had been introduced into evidence and played for the jury. He testified that it was not his voice on the tape. In support of this contention, Feddiman was permitted to play a tape recording on which he had duplicated some of the language of the initial statement in his "own" voice.

Feddiman's testimony at trial was materially different from the tape-recorded statement. He denied ever striking the victim or running her bicycle into the ditch. He stated that he had stopped on the side of the road because his car had made an unusual noise. Feddiman testified that the victim, whom he claimed to recognize from work, approached him on a bicycle. According to Feddiman, she stated that she had "never been with a black guy before" and essentially solicited sex from him.

According to Feddiman's testimony, the victim voluntarily left the roadside with him in his vehicle. Feddiman testified that they drove to a beach area known as Sandy Cove and that while inside the car, the victim wanted to commit fellatio and that he reluctantly agreed. Afterwards, according to Feddiman, they walked on the beach. Feddiman testified that the victim then went swimming. Thereafter, Feddiman stated, they again walked along the beach, "sat around," talked and drank beer over the next several hours.

After several hours, Feddiman testified that the victim wanted to go driving. He stated that they went to a dump site in the Frankford area, near his home. Feddiman testified that after arriving in this area, he and the victim again "sat around and talked." Thereafter, according to Feddiman, an act of consensual vaginal intercourse occurred at this location. Feddiman testified that ultimately he took the victim back to the location where he had picked her up.

*Jury Voir Dire/Racial Prejudice*

Feddiman contends that there was error in the jury selection process because the

---

**15.** Count 12—Unlawful Sexual Intercourse in the First Degree.

*voir dire* questions did not sufficiently address the issue of racial prejudice. Feddiman's defense counsel submitted written requests for the trial judge to ask two *voir dire* questions concerning possible racial prejudice. The first question submitted by defense counsel was:

> The victim in this case is a white person. The defendant is black. Do you have any prejudice, however slight, against black people which would [a]ffect you in any[ ]way in deciding this case in regarding their sexual proclivities?

This question was asked of the venire panel in exactly the same form that it was submitted by defense counsel. The second *voir dire* question proposed by defense counsel was:

> Do you have any prejudice against black people, excluding any prejudice relating to sexual proclivities?

The trial judge did not ask this question. However, the trial judge did ask the venire panel the following questions:

> Do you have any bias or prejudice either for or against the State or defendant?

> Is there any reason why you cannot give this case your undivided attention and render a fair and impartial verdict?

Feddiman contends that it was reversible error for the trial court not to ask the second *voir dire* question which he submitted, concerning prejudice against black people.

It is well established that *"[v]oir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored." *Rosales–Lopez v. United States*, 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981). An adequate *voir dire* is necessary to discover bias in prospective jurors and to assist the trial judge in his responsibility to remove prospective jurors who will not be able to hear the case impartially. *Id.* "Similarly, lack of adequate *voir dire* impairs the defendant's right to exercise peremptory challenges...." *Id.*[16]

However, trial judges have been reluctant to question jurors concerning possible racial prejudice in fear that such an inquiry would create the impression "that justice in a court of law may turn upon the pigmentation of skin [or] the accident of birth." *Ristanio v. Ross*, 424 U.S. 589, 596 n. 8, 96 S.Ct. 1017, 1021 n. 8, 47 L.Ed.2d 258 (1976). The United States Supreme Court has recognized the conflict between this justifiable hesitancy by trial judges and the need for the discovery of a juror who might be disqualified because of racial or ethnic prejudice. *Aldridge v. United States*, 283 U.S. 308, 310–11, 51 S.Ct. 470, 471–72, 75 L.Ed. 1054 (1931). The question of whether, upon the defendant's request, the trial court must inquire into any possible racial prejudice against the defendant, has been addressed by the United States Supreme Court.

The "special circumstances" under which the federal Constitution requires the question on racial prejudice were described in *Ristaino v. Ross*, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976). Special circumstances exist if racial issues are "inextricably bound up with the conduct of the trial." *Rosales–Lopez v. United States*, 451 U.S. at 189, 101 S.Ct. at 1634 (quoting *Ristaino v. Ross*, 424 U.S. at 597, 96 S.Ct. at 1021).[17] In the absence of "special circumstances," a plurality of the United States Supreme Court has held that the federal Constitution does not require a *voir dire* inquiry into the possible racial prejudice of potential jurors. *Rosales–Lopez v. United States*, 451 U.S. at 187–88, 192–94, 101 S.Ct. at 1636–37.

---

**16.** "The right of peremptory challenge originated under English law and was bestowed only upon a criminal defendant. It 'allowed to the prisoner an arbitrary and capricious species of challenge to a certain number of jurors, without showing any cause at all....'" Note, *Batson v. Kentucky and the Prosecutorial Peremptory Challenge: Arbitrary and Capricious Equal Protection?* 74 Va.L.Rev. 811 n. 2 (1988) (quoting ▪ W. Blackstone, Commentaries on the Laws of England 353 (G. Sharswood ed. 1859)).

**17.** Special circumstances have also recently been found to exist in the context of the sentencing hearing in a capital case. *Turner v. Murray*, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986).

Nevertheless, in its supervisory capacity, the same plurality opinion in *Rosales-Lopez* announced a non-constitutional requirement that federal courts must grant a defendant's request for a special *voir dire* inquiry, if the circumstances of the case reveal a "reasonable possibility" that racial prejudice may influence the jury. *Id.* at 190–91, 101 S.Ct. at 1635–36. The Court held that *Aldridge* and *Ristaino* read together, fairly imply that a reasonable possibility of racial or ethnic prejudice always exists, and therefore that federal trial courts must make an inquiry into that possibility, "when requested by a defendant accused of a violent crime and where the defendant and the victim are members of different racial or ethnic groups." *Id.* at 192, 101 S.Ct. at 1636. Federal trial courts are therefore held to a higher standard than that which is required by the United States Constitution. *Id.* at 190, 101 S.Ct. at 1635.

■ That same higher standard is applicable in the courts of this State by virtue of Article I, Section 7 of the Delaware Constitution. This Court has previously held that the improper injection of race into a criminal proceeding violates a defendant's right to due process and the right to a trial by an impartial jury, as guaranteed by the Constitution of this State. Del. Const. art. I, § 7. *Weddington v. State*, Del.Supr., 545 A.2d 607, 615 (1988); *Riley v. State*, Del.Supr., 496 A.2d 997, 1012 (1985), *cert. denied*, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986). In this case, Feddiman was accused of a series of violent crimes. Feddiman and the victim are members of different racial groups. Feddiman's attorney specifically requested the trial court to question the jurors during *voir dire* concerning the possibility of racial prejudice. Accordingly, the trial judge was required to question prospective jurors on racial prejudice. Del. Const. art. I, § 7.

■ Feddiman argues that the trial court's refusal to include in its *voir dire* the specific questions framed by his attorney, constituted an abuse of discretion. We disagree. The trial court was "not required to adopt defendant's proposed *voir dire* as its own." *Riley v. State*, 496 A.2d at 1007 (citing *Ham v. South Carolina*, 409 U.S. 524, 527, 93 S.Ct. 848, 850, 35 L.Ed.2d 46 (1973)). Subject to the essential demands of fairness, the trial court has broad discretion in determining the scope and form of questions to be asked on *voir dire*. *Ham v. South Carolina*, 409 U.S. at 528, 93 S.Ct. at 851; *Riley v. State*, 496 A.2d at 1006.

With respect to the inquiry into possible racial prejudice, as in all other cases, "the trial judge retains discretion as to the form and number of questions on the subject." *Turner v. Murray*, 476 U.S. 28, 37, 106 S.Ct. 1683, 1688, 90 L.Ed.2d 27 (1986). A defendant in a criminal case has no right to have all of *his* proposed *voir dire* inquiries asked by the Court. *Aldridge v. United States*, 283 U.S. at 310, 51 S.Ct. at 471; *Wright v. State*, Del.Supr., 374 A.2d 824, 829 (1977). "A judicial ruling on the scope of *voir dire* questioning will not be overturned absent an abuse of discretion" which prejudices the defendant's rights. *Riley v. State*, 496 A.2d at 1006.

In this case, the *voir dire* questions which were actually asked by the trial court revealed to the venire panel that the defendant and the victim belonged to different racial groups. The *voir dire* questions which were actually promulgated also inquired into the possibility of racial prejudice. In fact, one juror responded affirmatively to the question about racial prejudice and was promptly excused by the trial judge.[18]

We find no abuse of discretion in either the form or the number of *voir dire* questions which were asked of the venire panel by the trial judge. In our view, the *voir dire* questions actually asked by the trial

---

**18.** The following exchange took place with one prospective juror:

THE COURT: Mr. Thomas, which question did you answer yes?
THE JUROR: Prejudice.

THE COURT: Prejudice?
THE JUROR: Yes, sir.
THE COURT: All right, you may be excused from this case, Mr. Thomas. Thank you.

court were adequate and properly afforded Feddiman all of the rights that he is entitled to under both the federal Constitution and the Constitution of this State. *Turner v. Murray*, 476 U.S. at 37, 106 S.Ct. at 1688; *Rosales–Lopez v. United States*, 451 U.S. at 192, 101 S.Ct. at 1636; *Riley v. State*, 496 A.2d at 1007. Since Feddiman has failed to establish an abuse of discretion, his argument for a reversal of his convictions based upon an inadequate *voir dire* into the subject of possible racial prejudice must fail. *Id.*

### Race–Based Peremptory Challenges

Feddiman's next argument in this appeal is that the prosecutor impermissibly used race as a basis for exercising peremptory challenges. At one time, the law presumed that a prosecutor only exercised peremptory challenges in order to obtain a fair and impartial jury. *Swain v. Alabama*, 380 U.S. 202, 222, 85 S.Ct. 824, 837, 13 L.Ed.2d 759, *reh'g denied*, 381 U.S. 921, 85 S.Ct. 1528, 14 L.Ed.2d 442 (1965); *Riley v. State*, 496 A.2d at 1013. In *Swain*, the Court *noted* that a defendant could overcome this presumption by proving that the prosecutor had systematically exercised peremptory challenges to exclude members of a particular group over a *period of time*. *Swain v. Alabama*, 380 U.S. at 222–24, 85 S.Ct. at 836–38.

Many state courts "adopted *Swain's* dicta as the applicable test for determining whether peremptory challenges have been exercised on invidious grounds." *Riley v. State*, 496 A.2d at 1011–12. However, in *Riley*, this Court adopted a different standard. *Riley* held that "[t]o rebut the presumption" recognized in *Swain*, the defendant was only required to "make a *prima facie* showing that, considering all circumstances in the *given case*, there is a substantial likelihood that the prospective jurors are being peremptorily challenged solely on the basis of race." *Id.* at 1013 (emphasis added).

This area of the law was changed significantly by the United States Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). First, *Batson* held that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution precludes the prosecutor in a state criminal action from exercising peremptory challenges based upon race. *Id.* at 88–89, 106 S.Ct. at 1718–19.[19] Second, in *Batson*, the Court adopted an evidentiary burden, which was similar to our holding in *Riley*, and allowed "a defendant to use evidence gathered solely from *his own trial* to establish a *prima facie* case of the prosecutor's discriminatory use of peremptory challenges." Note, *Batson v. Kentucky and the Prosecutorial Peremptory Challenge: Arbitrary and Capricious Equal Protection?* 74 Va.L.Rev. 811, 815 (1988) (emphasis added). *See Riley v. State*, 496 A.2d at 1013. In particular, *Batson* held that a defendant could establish a *prima facie* case of purposeful discrimination "by showing that: (1) defendant is a member of a cognizable racial group; (2) the group's members have been excluded from the defendant's jury; and (3) the circumstances of the case raise an inference that the exclusion was based on race." Project: *Seventeenth Annual Review of Criminal Procedure*, 76 Geo.L.J. 969–70 (1988) (footnotes omitted).

*Batson* further held that if the trial judge is satisfied that the defendant has established a *prima facie* case "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." 476 U.S. at 97, 106 S.Ct. at 1723. The prosecutor's explanation for the peremptory challenges must be more than an affirmation of good faith or an assumption that the challenged jurors would be partial to the defendant because of race. *Id.* at 97–98, 106 S.Ct. at 1723–24. Although the prosecutor's explanation for the peremptory challenge "need not rise to the level justifying exercise of a challenge for

**19.** In a recent article, Professor Katherine Goldwasser argues against extending *Batson* to the use of peremptory challenges by criminal defendants. Goldwasser, *Limiting A Criminal Defen-*

*dant's Use of Peremptory Challenges: On Symmetry and the Jury in a Criminal Trial,* 102 Harv.L.Rev. 808 (1989).

cause," it must be related to the particular case to be tried. *Id.* at 97, 106 S.Ct. at 1723. *See also Riley v. State,* 496 A.2d at 1013.

In *Batson,* the United States Supreme Court declined "to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's [peremptory] challenges." 476 U.S. at 99, 106 S.Ct. at 1724. *See Baynard v. State,* Del.Supr., 518 A.2d 682, 688 (1986). Thus, "[t]he Supreme Court has left the lower courts to grapple with the proper implementation of the *Batson* test. They must determine not only the quantum of proof necessary for a defendant to establish a *prima facie* case but also the types of explanations sufficient to rebut the defendant's claim. Moreover, lower courts must adopt appropriate procedures for an adequate *Batson* hearing." Note, *Batson v. Kentucky and the Prosecutorial Peremptory Challenge: Arbitrary and Capricious Equal Protection?* 74 Va.L.Rev. 811, 817 (1988).

■ Prior to *Batson,* this Court concluded that it was not only desirable but necessary for this Court to "set out in general terms a procedure for trial courts to follow ... when they are fairly presented with a claim that peremptory challenges have been exercised on discriminatory grounds." *Riley v. State,* 496 A.2d at 1012–13. According to the procedure set forth in *Riley,* the initial burden to make a complete record in support of his claim is upon the defendant, after objecting to the State's exercise of its peremptory challenges. *Id.* at 1013. *See also, Baynard v. State,* 518 A.2d at 687; *Government of Virgin Islands v. Forte,* 806 F.2d 73, 75–76 (3d Cir.1986) *denial post-con. relief rev'd,* 865 F.2d 59 (1989). Once a *prima facie* showing,[20] as now outlined in *Batson,* has been made by the defendant, the burden will shift to the State to prove that the exercised challenges were not racially motivated. *Riley v. State,* 496 A.2d at 1013. When the burden shifts to the State to demonstrate that peremptory challenges were not exercised on the basis of race, "it must satisfy the [trial] court that its peremptory challenges were made on grounds of specific, individual juror bias, or on grounds reasonably related 'to the particular case o[n] trial or its [particular] parties or witnesses' and not solely on the ground of the juror's race." *Id.* (quoting *People v. Wheeler,* 583 P.2d 748, 765 (1978)). In our view, the foregoing procedures, and the duty imposed upon the State by this Court, in *Riley* are consistent with the principles enunciated by the United States Supreme Court in *Batson.*[21] *See Baynard v. State,* 518 A.2d 686–88.

■ Those procedures were followed in this case. Feddiman's attorney alleged that the prosecutor had used the race of several jurors as a basis for exercising peremptory challenges. It was unnecessary for the trial court to find that the burden to explain those peremptory challenges had shifted to the State because, in

---

20. As an example, the following forms of evidence may be employed in establishing the existence of a 'substantial likelihood' of the improper use of peremptory challenges.

(a) Defendant may show the State has challenged all the members of an identifiable racial group in the venire.
(b) Defendant may show the State used a disproportionate number of peremptory challenges against a particular racial group.
(c) Defendant may show the jurors challenged were homogeneous in only one respect —race.

*Riley v. State,* 496 A.2d at 1013 n. 20. *See also Mitchell v. State,* 295 Ark. 341, 750 S.W.2d 936 (1988) (exclusion of one minority group member is sufficient to establish a prima facie case when this juror is the only member of the defendant's race on the panel of prospective jurors); *Stanley v. State,* 313 Md. 50, 542 A.2d 1267, 1285 (1988) (same).

21. We also find that the procedure set forth in *Riley,* if the State does not meet its burden, is consistent with the holding in *Batson:*

If the court ... determines that the State has not met its burden, ... the jury is deemed unrepresentative, and the court must dismiss those jurors already selected. "So too it must quash any remaining venire, since the complaining party is entitled to a random draw from an entire venire—not one that has been partially or totally stripped of members of a cognizable group by the improper use of peremptory challenges." Accordingly, in such case a new venire must be drawn.

*Riley v. State,* 496 A.2d at 1013 (citation omitted).

response to that objection, the prosecutor offered to provide a neutral reason for each peremptory challenge that had been exercised. *See id.* The record reflects that the prosecutor gave the following reasons:

PROSECUTOR: As to Wayne Thompson, he had a five-page criminal record. There were a number of felonies with no disposition, and there were a number of misdemeanor convictions.

THE COURT: All right.

DEFENSE ATTORNEY: We object to that.

THE COURT: WHAT?

DEFENSE ATTORNEY: We certainly object to his being struck on those grounds, if there were not any convictions.

THE COURT: Why don't we let her finish her list of explanation?

PROSECUTOR: As to Dennis Nichols, Mr. Nichols slumped down in the chair, hiding his face, and he did not appear that he wanted to be here at all. He had a driving record that included a DUI, and I struck him.

THE COURT: I was surprised, based upon his demeanor, that you did not strike him first.

PROSECUTOR: He was avoiding any eye contact. Then when I went through, I noticed that Peggy Nichols, when I looked at the driving record that I ran, had the exact same address as Dennis Nichols. I was concerned that there would be some feeling against the State for striking Dennis Nichols by Peggy Nichols if he were her husband or something.

As regards Janet Brumble, she works at Perdue, as did Mr. Nichols. Again, I was not sure whether she may have known him.

I would note that at least two of the people who I struck were replaced with black jurors, and the State is not seeking to strike them for any reason.

THE COURT: You ran out of strikes.

PROSECUTOR: But I had opportunity to do so. In fact, I did not strike only black people; I struck white people.

THE COURT: I agree. I note there are four blacks on the panel and one alternate.

Feddiman's attorney argued that the prosecutor's explanations for exercising each peremptory challenge were insufficient. Feddiman's attorney renewed his objection and asked the trial judge to find that the prosecutor's exercise of peremptory challenges had been racially motivated. The trial judge made the following ruling:

THE COURT: I am satisfied that a substantial criminal record at a misdemeanor level and unresolved felony charges is an adequate reason to strike a juror.

I am, likewise, convinced that Mr. Nichols' demeanor in the jury box was such that it was not improper to strike him on the basis of demeanor.

Peggy Nichols having the same last name and same address seems to me to be adequate. I have some concern over Janet Brumble working at the same place. But I am still looking at a jury panel that is one-third black, which is substantially higher than the portion of the population, and fifty percent of the alternates are black.

While I would have to be concerned with any pattern of prejudice that would be exhibited by the State in this case, as you note, I have made a list of names because I was concerned that four of the five strikes were black. There was one content. The content came with black jurors on the panel. It gave me cause for making an independent inquiry had you not raised the question.

I am satisfied, based upon the explanations given by [the prosecutor], my own observations of the jury panel, and the fact that I have tried numerous cases involving multi-racial crimes involving black defendants, that [this prosecutor], in the past, has never exhibited a pattern of excluding racially.

I note your objection. I am satisfied that a suitable jury panel has been seated.

As the *Batson* Court noted " 'a finding of intentional discrimination [or a lack

thereof] is a finding of fact' entitled to appropriate deference by a reviewing court. Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson v. Kentucky*, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21 (citing *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)).[22] This Court acknowledged and adopted those principles in *Baynard v. State*, 518 A.2d at 688. In Feddiman's case, the trial judge found that the State had " 'adequately explained the basis for the exercise of its challenges' and had 'met its burden' by articulating 'legitimate non-discriminatory reasons for its exercise of peremptory challenges.' " *United States v. Cartlidge*, 808 F.2d 1064, 1070 (5th Cir.1987).

The record in this case demonstrates that the trial court critically evaluated the "race-neutral" reasons which the prosecutor gave for exercising each peremptory challenge. The trial court also "appraised the demeanor and credibility of both the potential jurors and the prosecutor and determined that the State's exercise of its peremptory challenges was nondiscriminatory." *Baynard v. State*, 518 A.2d at 688. The trial court concluded that, assuming arguendo, Feddiman had "succeeded in making out a *prima facie* case of purposeful discrimination, the prosecutor successfully rebutted the discriminatory inference by proving that the challenges were based on articulable and specific racially neutral criteria." *United States v. Cartlidge*, 808 F.2d at 1070.[23]

██ We are satisfied that the analysis of the prosecutor's explanations by the trial court, and the conclusions reached by the trial court concerning those explanations, are supported by the record. Accordingly, the decision of the Superior Court, that Feddiman had failed to meet his burden of proof in showing a discriminatory use of peremptory challenges by the State, is affirmed.[24]

## Motion To Dismiss Multiple Counts of Unlawful Sexual Intercourse in the First Degree

Feddiman was charged with eight separate counts of Unlawful Sexual Intercourse in the First Degree (Counts 4, 5, 6, 7, 9, 10, 11, and 12). The Superior Court granted Feddiman's defense attorneys motion for a bill of particulars with respect to those offenses. After receiving the State's response to the motion for a bill of particulars, Feddiman's attorneys filed a pretrial motion to dismiss all but one count of Un-

---

**22.** For a discussion of the implementation of *Batson* in the trial courts, see Note, *Batson v. Kentucky and the Prosecutorial Peremptory Challenge: Arbitrary and Capricious Equal Protection?* 74 Va.L.Rev. 811, 817–36 (1988).

**23.** *Cf. e.g., Taitano v. Commonwealth*, 4 Va.App. 342, 358 S.E.2d 590, 592–93 (1987); *People v. Talley*, 152 Ill.App.3d 971, 105 Ill.Dec. 800, 809, 504 N.E.2d 1318, 1327 (1987); *See e.g., United States v. Forbes*, 816 F.2d 1006, 1010–11 (5th Cir.1987); *United States v. Love*, 815 F.2d 53, 54–55 (8th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 177, 98 L.Ed.2d 130 (1987); *United States v. Vaccaro*, 816 F.2d 443, 457 (9th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 262, 98 L.Ed.2d 220 (1987). *See also, Tompkins v. State*, 727 S.W.2d 585, (Tex.Crim.App.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1727, 100 L.Ed.2d 192 (1988); *State v. Lewis*, 293 S.C. 107, 359 S.E.2d 66, 68 (1987); *United States v. Woods*, 812 F.2d 1483, 1487 (4th Cir.1987).

**24.** Because of the comments by the trial judge in announcing his decision, we are compelled to point out that the fact that Feddiman's jury consisted of eight whites and four blacks is not determinative when an issue of discrimination is raised. The Court in *Batson* noted that " '[a] single invidiously discriminatory governmental act' is not 'immunized by the absence of such discrimination in the making of other comparable decisions.' " 476 U.S. at 95, 106 S.Ct. at 1722 (quoting *Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266 n. 14, 97 S.Ct. 555, 564 n. 14, 50 L.Ed.2d 450 (1977)). Despite an identical jury composition, the United States Supreme Court reversed a capital sentence, due to an inadequate *voir dire* into racial prejudice. *Turner v. Murray*, 476 U.S. at 37, 106 S.Ct. at 1688. Other courts have reached a similar conclusion in the context of peremptory challenges. *Fleming v. Kemp*, 794 F.2d 1478, 1483 (11th Cir.), *vac. denied*, 478 U.S. 1002, 106 S.Ct. 3314, 92 L.Ed.2d 706 (1986); *United States v. Battle*, 836 F.2d 1084, 1086 (8th Cir.1987); *Stanley v. State*, 313 Md. 50, 542 A.2d 1267, 1283–86 (1988).

lawful Sexual Intercourse in the First Degree, on the grounds of multiplicity.[25] The motion to dismiss was denied by the Superior Court.

▮ "Multiplicity is defined as the charging of a single offense in more than one count" of an indictment. *Harrell v. State*, 88 Wis.2d 546, 277 N.W.2d 462, 464–65 (1979). The division of a single offense into multiple counts of an indictment violates the double jeopardy provisions of the Constitutions of the State of Delaware and of the United States. Del. Const. art. I, § 8; U.S. Const. amend. V. Feddiman's argument in the Superior Court and in this appeal, is that the State's allegations in eight of the counts in the indictment, if true, only prove one *continuous* act of sexual intercourse. The State contends that each of the eight counts in the indictment, represents an independent, intentional sexual assault upon the victim by Feddiman.

The State's response to Feddiman's request for a bill of particulars related each of the eight counts of Unlawful Sexual Intercourse in the First Degree to a specific location and to a particular sexual act.[26] Restated in chronological order, the State's response to Feddiman's request for a bill of particulars represents that the State would prove that Feddiman 1) forced the victim to commit fellatio while riding in the car to the beach (Count 4); 2) forced the victim to engage in vaginal sexual intercourse in the car at the beach (Count 7); 3) thereafter, forced the victim to commit fellatio again, in the car, at the beach (Count 5); 4) forced the victim to commit fellatio on the sand, near the water, at the beach (Count 6); 5) forced the victim to engage in vaginal sexual intercourse again, in the car, at the beach (Count 9); 6) forced the victim to engage in vaginal intercourse from the rear, in the car, at the dump site (Count 10); 7) forced the victim to commit fellatio, in the car, at the dump site (Count 11); and 8) forced the victim to engage in vaginal intercourse from the rear, outside of the car, at the dump site (Count 12).[27]

This Court has previously held that a "continuum of criminal activity can constitute a violation of several distinct criminal

---

25. COMES NOW, the defendant, acting by and through his attorneys, who make request that Count 5, Count 6, Count 7, Count 9, Count 10, Count 11, and Count 12 be dismissed as grounds that they are multiplicitus [sic] with Count 4. By this it is met [sic] that the State is taking one act and charging in multiple counts.

26. As regards [to] each count of Unlawful Sexual Intercourse in the First Degree, please be advised of the following:

Count 4. The offense is alleged to have occurred while driving west on County Route #54, west of Fenwick. The defendant was seated, operating the motor vehicle, the victim pulled to a leaning position over him. The sexual act was oral penetration.

Count 5. The offense is alleged to have occurred just off of County Route #394, east of Sound Church, in the vehicle while it was parked. The position was the same as in Count 4. The sexual act was the same as in Count 4.

Count 6. The offense is alleged to have occurred on the beach or sand area at the same location as in Count 5. The sexual act was the same as in Count 4. The defendant was standing in front of the victim who was on her knees.

Count 7. The offense is alleged to have occurred in the vehicle at the same location as Count 5. The sexual act was vaginal pen-

etration. The defendant was seated and the victim was straddling the defendant, facing him.

Count 9. The offense is alleged to have occurred in the car. The sexual act was vaginal penetration. The victim was laying on the seat of the car; the defendant was on top [of] her. The location is the same as in Count 5.

Count 10. The offense is alleged to have occurred at the old Frankford dump area on Delaware Avenue, in Frankford. The sexual act was vaginal penetration from the rear. The offense occurred in the vehicle's front seat. Both the victim and the defendant were on their knees on the seat.

Count 11. The offense is alleged to have occurred at the same location as Count 10. The sexual act was oral penetration. The offense occurred in the car. The position was as that in Count 4.

Count 12. The offense is alleged to have occurred at the same location as Count 10. The sexual act was vaginal penetration from the rear. The defendant and victim both were standing outside the vehicle, leaning inside of it.

27. The testimony of the victim was consistent with the State's response to the bill of particulars. The testimony of the victim, as reflected in the record, was chronologically set forth in this Court's recitation of the facts.

statutes if each statutory provision requires proof of a fact the other does not." *Weber v. State,* Del.Supr., 547 A.2d 948, 962 (1988). Similarly, "[a] person who commits multiple sexual assaults upon the same victim may be held responsible for, and punished for, each separate and distinct act," albeit a violation of the same statute. *Harrell v. State,* 277 N.W.2d at 471. One is not allowed to "take advantage of the fact that he has already committed one sexual assault on the victim and thereby be permitted to commit further assaults on the same person with no risk of further punishment for each assault committed. Each act is a further denigration of the victim's integrity and a further danger to the victim." *Id.* at 469.[28]

This Court has held that "[w]hether a course of conduct involving multiple sexual assaults permits prosecution for more than one statutory offense, of rape, ultimately turns on the facts, particularly the timing between the sexual acts and the physical movement of the victim between the acts." *Wyant v. State,* Del.Supr., 519 A.2d 649, 661 (1986). The State's allegations in the record of the variations in the sexual acts, the physical movement of the victim between the acts, and the timing between the sexual acts, was sufficient to support Fed-

diman's prosecution for eight separate offenses of Unlawful Sexual Intercourse in the First Degree. *Id.* Feddiman's argument to the contrary is without merit. We find that the Superior Court properly denied the motion by Feddiman to dismiss all but one count of Unlawful Sexual Intercourse in the First Degree, on the grounds of multiplicity.

### *Jury Instructions—Multiple Sexual Offenses*

 The next issue raised by Feddiman in this appeal also relates to the multiple charges of Unlawful Sexual Intercourse in the First Degree. Feddiman's attorney prepared a written instruction and requested that it be given by the trial judge. The avowed purpose of the proposed instruction was to assist the jury in determining whether the numerous counts of Unlawful Sexual Intercourse in the First Degree were one continuing manner of behavior and, therefore, constituted only one act or crime, or if they were indeed, separate acts and therefore, separate crimes. The instruction requested by Feddiman's attorney was based on the reported opinion of *Harrell v. State,* 277 N.W.2d at 472-73.[29]

The Superior Court did not give the jury instruction that was proposed by Feddi-

---

**28.** [W]e do not agree that a man who has raped a woman once may again assault and ravish her with impunity, at another time and at another place, as was done here. An intent was formed to rape her again. The evidence of the second rape was entirely additional to that of the first. Additional orders were given to the captive female, an intent to have her again was formed and was manifested, and the crime committed. Certainly there was separate and additional fear, humiliation and danger to the victim.

We hold that separate acts of rape, committed at different times and places and the product of several intents, are severably punishable.

*Lillard v. State,* 528 S.W.2d 207, 211 (Tenn.Crim. App.1975).

**29.** The suggested jury instruction prepared by Feddiman's attorney was:

As part of your deliberations you must decide whether the sexual acts with which defendant is charged, should you find him to be the perpetrator thereof, consists of one continuing manner of behavior such that it is one

act or crime, or in the alternative, if it is several acts or crimes. In deciding this you may take into account these individual factors:

1. The nature of the act.
2. Time involved overall and between alleged behavior.
3. Whether the incident happened in one location or a variety of locations, which is relevant to you [for] the distance of transport involved.
4. The intention or state of mind of the accused.
5. The effect of multiple punishments for one act—reason and general common sense should guide you as regards this element.
6. Muscular contraction of perpetrator—this is akin to the physical response of climax and may[ ]be considered by you also.
7. Number of victims—this does not appear to be relevant in the case at hand.

You should apply hte [sic] above factors, should you find the accused to have committed criminal acts or act against the victim in determining the number of counts of which you may find him guilty.

man's attorney. However, the Superior Court agreed to specifically instruct the jury on the issue that had been raised. The instruction actually given to the jury by the Superior Court, was as follows:

THE COURT: The defendant is charged with eight separate counts of unlawful sexual intercourse in the first degree. In order to find the defendant guilty as to each count, you must find that a separate and distinct act occurred.

In determining whether a separate and distinct act occurred, you may consider the time period between the acts; any change in location; the nature of the act; the intent of the defendant, that is, his specific intent to commit a separate additional sexual act; his muscle contraction; that is, did a muscle contraction or ejaculation complete a separate and distinct act. Please note that the Delaware statute does not require emission to complete a sexual act.

You may consider these factors, but you are to use your common sense and consider all of the evidence in determining, as to each count, whether a separate and distinct act occurred.

A defendant is entitled to a correct statement of the substantive law. *Miller v. State*, Del.Supr., 224 A.2d 592, 596 (1966). However, the Superior Court was not required to instruct the jury in the precise form proposed by Feddiman's attorney. *Id.* If the substantive law is stated correctly, "a trial court's instructions to the jury will not serve as grounds for reversible error if they are 'reasonably informative and not misleading, judged by common practices and standards of verbal communication.'" *Sheeran v. State*, Del.Supr., 526 A.2d 886, 894 (1987) (quoting *Baker v. Reid*, Del.Supr., 57 A.2d 103, 109 (1947)).

This Court has held that "[w]hether a course of conduct involving multiple sexual assaults permits prosecution for more than one statutory offense, of rape, ultimately turns on the facts, particularly the timing between the sexual acts and the physical movement of the victim between the acts." *Wyant v. State*, 519 A.2d at 661.[30] In this case, the jury instructions, as given, were clearly a correct statement of the substantive law and were "reasonably informative and not misleading, judged by common practices and standards of verbal communications." *Baker v. Reid*, 57 A.2d at 109. Moreover, the substance of the instructions actually given were not only a correct statement of the law, but were almost exactly what Feddiman's attorney had requested. We find no error in the instructions which were given to the jury on the issue of multiple acts versus a single act of Unlawful Sexual Intercourse in the First Degree.

### Transcript of Tape Recording

■ At trial, and in this appeal, Feddiman's attorney alleges error with respect to the State's use of the transcript of his tape-recorded statement to the police. This Court recently addressed the issue of whether or not transcripts may properly be used in conjunction with an audio recording of a statement or conversation. *See Atkins v. State*, Del.Supr., 523 A.2d 539, 543–545 (1987), (discussing *United States v. Carson*, 464 F.2d 424 (2d Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219 (1972); *United States v. Turner*, 528 F.2d 143 (9th Cir.), *cert. denied*, 423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975)). We held that "[w]hen original tape recordings are properly introduced into evidence, transcriptions of those recordings *may* also be received into evidence with the exercise of judicial discretion." *Atkins v. State*, 523 A.2d at 544–45 (emphasis in original).

In exercising its discretion, we held that the trial court should first satisfy itself that the transcript is accurate. *Id.* at 545. Then, it must decide how, if at all, the transcripts are to be used. *Id.* If the trial court concludes that the "transcripts are needed for any purpose, the jury must be carefully instructed concerning the use of the transcripts and must specifically be in-

---

**30.** Sexual Intercourse, as defined by statute, does not require that there be ejaculation. 11 *Del.C.* § 761(e) (1987 & Supp.1988).

structed that the tape recording and not the transcript is the evidence of the conversation." *Id.*

In this case, the actual tape recording of Feddiman's statement to the police was admitted into evidence at trial as an exhibit. Prior to trial, Feddiman's attorney had been provided with a copy of the transcript of Feddiman's tape-recorded conversation. At trial, the judge was provided with a copy of the transcript. The trial judge compared the transcript with the tape recording and concluded that the transcript was accurate.

The trial judge found that the tape recording was somewhat difficult to hear. Therefore, before Feddiman's tape-recorded statement to the police was played for the jury, with the court's permission, the State distributed a copy of the transcript to the jury. After the tape recording had been played, the trial court instructed the jury with respect to the limited purpose of the transcript as follows:

> THE COURT: Ladies and gentlemen of the jury, the document that was provided for you was provided in an attempt to help you clearly understand what was said. It is intended to be an accurate transcript of this tape-recording. The tape-recording is the best evidence of what was said, and to the extent that you believe the tape-recording disagrees, in any way, with the transcript, you are to disregard the transcript and give weight to what you have heard on the tape.
>
> The record should reflect that the transcripts are being collected.

The trial court completely complied with this Court's holding in *Atkins*. First, the trial court determined that the transcript was accurate. Second, the trial court found that the tape recording was difficult to hear and that the transcript would be helpful to the jury as a listening aid. Third, the trial court determined that the transcript should not be introduced into evidence but should only be used as a listening aid. Finally, the trial court instructed the jury with respect to the limited purpose of the transcript and reminded the jury that the tape recording, and not the

transcript, was the evidence of Feddiman's statement to the police. We find no error in the manner in which the transcripts were used at Feddiman's trial.

### Conclusion

The judgments of the Superior Court which resulted in Feddiman's convictions are AFFIRMED.