ERNEST T. CARLETTI, Defendant Below-Appellant,
v.
STATE OF DELAWARE Plaintiff Below-Appellee.
No. 53, 2008
Supreme Court of Delaware
Submitted: October 3, 2008
Decided: December 3, 2008
Before STEELE, Chief Justice, BERGER, and RIDGELY, Justices.

ORDER
HENRY DuPONT RIDGELY, Justice
This 3rd day of December 2008, it appears to the Court that:
(1) Defendant-Appellant Ernest Carletti appeals from his Superior Court convictions of two counts of rape in the first degree and one count of kidnapping. Carletti makes two arguments on appeal. First, he contends that the court violated his Double Jeopardy protections by concluding that two separate rape offenses had occurred. Second, he contends that the court abused its discretion in denying his motion for a continuance filed eighteen days prior to trial in order to obtain substitute counsel. We find no merit to his arguments and affirm.
(2) On the evening of May 21, 2003, J.S.,[1] a nineteen-year old freshman at the University of Delaware, attended a party to celebrate the end of classes. She had two beers and left around 1:30 a.m. Before she left, J.S. called a friend to meet her along the way and accompany her back to her dormitory. When she did not see her friend at their designated meeting place, J.S. sat down and waited.
(3) While J.S. was waiting, a dark-colored sedan pulled up and the driver, Carletti, propositioned her, offering $100 if she would put on handcuffs. J.S. refused, but Carletti persisted. Eventually, Carletti displayed what appeared to be a chrome handgun and pulled J.S. into the car. Once she was in the passenger seat, Carletti pushed J.S.'s face into her lap, blindfolded her with duct tape, handcuffed her hands behind her back, and shackled her ankles. He then drove for approximately twenty to twenty-five minutes, after which J.S. remembered getting out of the car, walking on gravel, then long grass, and then being dragged into a house. Once inside, she was taken down steps into a basement and placed on a couch after walking on a wooden floor.
(4) After being placed on the couch, J.S. testified that Carletti began to kiss her; when she resisted, he pinched her breasts and nipples. He then took her still bound, shackled, handcuffed, and blindfoldedfrom the couch to the floor. She testified that he placed her before him on her knees on the floor and, after putting on a condom, forced his penis into her mouth. J.S. resisted and Carletti grew impatient, eventually taking his penis from her mouth and returning her to the couch. She was then left alone in the basementstill bound, shackled, handcuffed, and blindfoldedfor about five or ten minutes while Carletti went upstairs. She heard the sound of Carletti and dogs walking above.
(5) J.S. testified that Carletti came back downstairs and began kissing her again, but she again resisted. He then removed the handcuffs, removed her jacket, and recuffed her. He also removed J.S.'s shoes and replaced them with some sort of "heavy or rubbery shoes." Carletti again took her from the couch to the floor, placing her in a kneeling position. He again forced his penis into her mouth, but again became frustrated because J.S. "wasn't doing what he said," and he again removed his penis from her mouth. J.S. was not certain how long this second incident lasted, but she believed it was shorter than the first.
(6) According to J.S.'s testimony, Carletti then took her from the floor and placed her on her stomach on a padded tablestill bound, shackled, handcuffed, and blindfolded. He then connected chains to the handcuffs and ankle shackles and placed something around her neck. She was hoisted up by the chains and a ball gag was placed in her mouth. As she hung from the chains by her hands and feet, she had difficulty breathing and could hear someone masturbating. At the same time, she heard Carletti give her orders, telling her to say "yes, master" to him. Eventually, unable to breathe, her head dropped. She was then released from the chains and dropped to the table.
(7) Carletti then took J.S. from the housestill bound, shackled, handcuffed, and blindfoldedand put her back in the car. On the way back to campus, Carletti apologized to J.S., but told her not to tell anyone. He then removed the ankle shackles and the handcuffs, securing her hands behind her with duct tape, and pushed her out of the car. J.S. started to scream for help and tore herself out of the tape. She ran back to her dorm room and notified the police.
(8) Detective Keld interviewed and photographed J.S. in the early morning hours of May 22, 2003. She had marks on her wrists and ankles from the handcuffs and shackles. The next day, Detective Keld and J.S. returned to the spot where she had been left the night before and located the duct tape. A year later, after little progress was made in identifying J.S.'s attacker, a composite sketch was prepared. Carletti's fingerprint was recovered from the duct tape and it was determined that he had owned a black sedan in 2003. A walkthrough of Carletti's home corroborated a number of the details supplied by J.S.: there was a gravel driveway, the basement of the house had wooden floors with area rugs, there was a padded weight bench, and an I-beam in the ceiling of the basement.
(9) On September 18, 2006, Carletti was arrested and charged with six counts of rape in the first degree, one count of kidnapping, and one count of possession of a deadly weapon during the commission of a felony. He was indicted on October 2, 2006. On November 28, 2006, Carletti moved for dismissal of five of the rape charges based on the multiplicity doctrine. The Superior Court granted the motion in part, dismissing Counts III, IV, V, and VIeffectively merging Counts I, III and V, and Counts II, IV, and VI into two charges of first degree rape based on physical injury caused during the act of non-consensual intercourse.[2] On June 15, 2007, the court granted the State's request that the court dismiss Counts I and II and reinstate Counts V and VI, to enable the State to proceed on the "rape while kidnapped" theory charged in Counts V and VI.
(10) The initial scheduling order issued November 2, 2006, set a trial date for March 29, 2007. However, on December 26, 2006, the State moved for a continuance to allow J.S.'s father to be present during the trial to provide support. That request was granted on January 3, 2007 and a new trial date was set for September 3, 2007. In May 2007, defense counsel moved for a continuance due to a scheduling conflict. That request was granted and, on August 28, 2007, the court entered a scheduling order setting a trial date for November 13, 2007. On October 26, eighteen days before trial was set to begin, defense counsel sought to withdraw and another attorney moved to have a Maryland attorney admitted pro hac vice in the case. She also moved for a third continuance to allow the Maryland attorney time to prepare for trial. After a hearing, the court denied the request.
(11) On November 13, the case proceeded to trial as scheduled with original defense counsel. J.S. identified Carletti as the man who had abducted and raped her. Carletti testified in his own defense. He admitted that he was the man who took J.S. from the corner in Newark; however, he denied any criminal wrongdoing, claiming only that "things went a little too far."
(12) On November 19, 2007, Carletti was convicted of two counts of rape in the first degree and one count of kidnapping. Carletti filed a timely motion for judgment of acquittal on November 26, 2007, again claiming that his convictions violated the multiplicity doctrine. The motion was denied on January 17, 2008. He was sentenced on January 31, 2008 and this appeal followed.
(13) Carletti first contends that the Superior Court erred in denying his motion to dismiss Counts I and II as being part of the same course of conduct, thereby violating the Double Jeopardy clause of the United States Constitution. We review de novo both a claim for infringement of constitutional rights[3] and denial of an application for merger.[4] We review the denial of a motion to dismiss counts of an indictment for abuse of discretion.[5]
(14) The Double Jeopardy Clause of the Fifth Amendment guarantees that no persons shall "be subject for the same offense to be twice put in jeopardy of life and limb."[6] "The constitutional principal of double jeopardy protects a defendant against (1) successive prosecutions; (2) multiple charges under separate statutes requiring proof of the same factual elements; and (3) multiple charges under the same statute."[7] Multiplicity occurs when an individual is charged with more than one count of a single offense.[8] Generally, "[d]ividing one offense into `multiple counts of an indictment violates the double jeopardy provisions of the constitution of the State of Delaware and of the United States.'"[9]
(15) In Wyant v. State,[10] we held that in the context of sexual assault, "[w]hether a course of conduct involving multiple sexual assaults permits prosecution for more than one statutory offense, of rape, ultimately turns on the facts, particularly the timing between the sexual acts and the physical movement of the victim between the acts." In that case, the defendant entered the victim's home and attempted to rape her by anal intercourse downstairs. He then vaginally raped the victim and thereafter forced her upstairs, where he committed a further act of rape and sexual assaults. The defendant then forced the victim back downstairs where he raped her again.[11] We found that these facts supported the defendant's multiple convictions for two counts of rape and one count of attempted rape.
(16) In Feddiman v. State,[12] we also found the facts supported multiple convictions of rape. In that case, the defendant ordered the victim to get in his car and ordered her to perform oral sex on him while he was driving. He then stopped at a beach and, while still in the car, ordered the woman to engage in vaginal intercourse, and then forced her to again perform oral sex on him. The defendant then forced the victim out of the car and onto her knees and again demanded that she perform fellatio. He then took her back to the car and forced her to engage in vaginal intercourse. The defendant then left the beach area with the victim and drove fifteen minutes away, where he forced her to have vaginal intercourse again. He then walked her from the car to the edge of a pit, but took her back to the car where he forced her to perform oral sex again him again. Finally, the defendant removed the victim from the car and forced her to engage in vaginal intercourse.[13]
(17) Feddiman was charged with eight separate counts of unlawful sexual intercourse in the first degree. We rejected his multiplicity challenge, finding that the "allegations in record of the variations in the sexual acts, the physical movement of the victim between the acts, and the timing between the sexual acts, was sufficient to support [the defendant's] prosecution for eight separate offenses...."[14] We further explained that:
This Court has previously held that a "continuum of criminal activity can constitute a violation of several distinct criminal statutes if each statutory provision requires proof of a fact the other does not." Similarly, "[a] person who commits multiple sexual assaults upon the same victim may be held responsible for, and punished for, each separate and distinct act," albeit a violation of the same statute. One is not allowed to "take advantage of the fact that he has already committed one sexual assault on the victim and thereby be permitted to commit further assaults on the same person with no risk of further punishment for each assault committed. Each act is a further denigration of the victim's integrity and a further danger to the victim."[15]
(18) In contrast, in Williams v. State,[16] we held that the defendant's conviction for two counts of possession with intent to deliver cocaine was multiplicitous. In that case, the two counts of PWID were based on two separate searches, in two different locations: one in the defendant's car, the other in the defendant's home.[17] We adopted a test based on intent and found that because the defendant had one intended purpose for all the cocaine discovered, he could only be charged with one count of PWID.[18] We reconciled this holding with Feddiman by explaining that in Feddiman, for each separate and distinct sexual act, the defendant "formulated the intent to commit each assault and separately violated the same statute numerous times during one continuous attack of the victim."[19] The defendant in Williams "did not formulate two separate intents to distribute cocaine even though he separated the cocaine into different caches."[20]
(19) We addressed multiplicity more recently in Pierce v. State,[21] where the defendant attacked an apartment manager in the office of the apartment complex. He first attempted to vaginally rape the victim in a bathroom by forcing her to kneel in front of the bathtub. He then immediately moved her to the toilet next to the bathtub and attempted to penetrate her again in the same manner.[22] Failing in his second attempt, the defendant forced the victim into a bedroom where he committed vaginal rape. He then forced the victim back into the bathroom and vaginally raped her again.[23] The four acts of rape occurred within a span of less than fifteen minutes.[24] We found that rather than a single, ongoing incident, the evidence indicated "a sufficient break in conduct and time to constitute separate and distinct crimes."[25] Thus, we found that the defendant committed four separate sexual acts.
(20) Here, each assault was clearly defined by Carletti moving the defendant to the floor. Each assault had its own beginning and end. Each assault was separated by at least five minutes. In between the incidents, Carletti left J.S. alone, he also temporarily released her from her handcuffs, removed her jacked and changed her shoes. Each assault created a separate and additional fear, humiliation and danger to J.S. Unlike the defendant in Williams, Carletti formulated the intent to commit each assault and separately violated the same statute twice. Rather than a single, ongoing incident, the evidence indicated "a sufficient break in conduct and time to constitute separate and distinct crimes." Carletti's argument is without merit.
(21) Carletti next contends that the Superior Court erred in denying his request for a continuance to allow counsel of his choice to enter the case. We review the denial of a request for a continuance for the purpose of securing new counsel for abuse of discretion.[26]
(22) In United States v. Gonzalez-Lopez,[27] the United States Supreme Court stated that the erroneous deprivation of a defendant's choice of counsel is a "structural error" which requires no showing of prejudice and entitles the defendant to a reversal of his conviction. Nevertheless, the Court explained that its decision did not abrogate "a court's power to enforce rules or adhere to practices that determine which attorney may appear before it, or to make scheduling and other decisions that effectively exclude a defendant's first choice of counsel."[28] Moreover, the court expressly noted that its decision preserved "a trial court's wide latitude in balancing the right to counsel against the needs of fairness, and against the demands of its calendar."[29]
(23) In assessing the reasonableness of the Superior Court's decision to deny a request for substitute counsel, we will examine whether there have been any previous complaints about counsel, whether there had been a prior opportunity to obtain substitute counsel, and whether the request appeared to be a tactic for delay.[30] "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."[31] Furthermore, pertinent circumstances that the court should consider include the State's position, the rights of the moving defendant, the need for calendar control, as well as the efficient and effective administration of criminal justice.[32]
(24) Here, there had been no previous complaint by Carletti regarding defense counsel. The court also had a significant interest in calendar control. By the time the defense moved for the admission of substitute counsel and a continuance on October 26, 2007, the trial, initially set for March 29, 2007, had already been postponed twiceonce at the request of defense counsel and once at the request of the State. Carletti sought an addition continuance only eighteen days before the trial. Additionally, the case was one of the oldest cases on the Superior Court's criminal calendar. Thus, the court's interest in calendar control weighed heavily against the continuance.
(25) The State also had a significant interest in proceeding to trial as scheduled. Subpoenas had already been issued for that date and the State's expert witnesses were already scheduled. The alteration would also cause inconvenience to the witnesses and difficulty in rescheduling. Thus, the State's position weighed against the continuance.
(26) Finally, the interests of justice supported having the trial as scheduled. The case had already been protracted, with the request coming nearly four and a half years after the assault occurred in May 2003. Thus, the efficient and effective administration of justice weighed against the continuance. We conclude that the Superior Court's denial of Carletti's motion for a continuance was not an abuse of discretion.
NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.
NOTES
[1] The initials represent a pseudonym we have assigned to the victim on appeal pursuant to DEL. SUPR. CT. R. 7(d).
[2] Counts I and II charged Carletti with two acts of intercourse during which he caused physical injury in violation of 11 Del. C. § 773(a)(1). Counts III and IV charged Carletti with two acts of intercourse during which he displayed or represented he possessed a deadly weapon in violation of 11 Del. C. § 773(a)(3). Counts V and VI charged Carletti with two acts of intercourse during the commission of a felony (kidnapping) in violation of 11 Del. C. § 773(a)(2)(a). The court found that Carletti could be convicted for "each separate and distinct act," but "dissect[ing] a statute, apply[ing] a single act to the subparts, and permit[ing] multiple counts of the same statute based on one act violated the multiplicity doctrine.
[3] Williamson v. State, 707 A.2d 350, 362 (Del. 1998).
[4] Williams v. State, 818 A.2d 906, 909 (Del. 2002).
[5] State v. Harris, 616 A.2d 288, 291 (Del. 1992).
[6] U.S. CONST. amend. V; DEL. CONST. art. I, § 8.
[7] Williams v. State, 796 A.2d 1281, 1285 (Del. 2002) (citing Schiro v. Farley, 510 U.S. 222, 2293-0 (1994); Blockburger v. U.S., 284 U.S. 299 (1932); U.S. v. Forman, 180 F.3d 766, 769 (6th Cir. 1999)); see also Washington v. State, 836 A.2d 485, 487 (Del. 2003).
[8] Feddiman v. State, 558 A.2d 278, 288 (Del. 1989).
[9] Williams, 796 A.2d at 1285 (quoting Feddiman, 558 A.2d at 288).
[10] 519 A.2d 649, 661 (Del. 1986) (citing Harrell v. State, 277 N.W.2d 462, 469 (Wis. 1979)).
[11] Id. at 652.
[12] 558 A.2d 278 (Del. 1989).
[13] Id. at 280-81.
[14] Id. at 289
[15] Id. at 288-89 (quoting Weber v. State, 547 A.2d 948, 962 (1988)(emphasis added); Harrell, 277 N.W.2d at 469, 471). We further quoted with approval a Tennessee case in a footnote:

[W]e do not agree that a man who has raped a woman once may again assault and ravish her with impunity, at another time and at another place as was done here. An intent was formed to rape her again. The evidence of the second rape was entirely additional to that of the first. Additional orders were given to the captive female, an intent to have her again was formed and was manifested, and the crime committed. Certainly there was separate and additional fear, humiliation and danger to the victim. We hold that separate acts of rape, committed at different times and places and the produce of several intents, are severally punishable.
Id. at 289 n.28 (quoting Lillard v. State, 528 S.W.2d 207, 211 (Tenn. Crim. App. 1975)).
[16] 796 A.2d 1281, 1283 (Del. 2002).
[17] Id. at 1283-84.
[18] Id. at 1285-86.
[19] Id. at 1288.
[20] Id.
[21] 911 A.2d 793 (Del. 2006).
[22] Pierce, 911 A.2d at 795
[23] Id. at 795
[24] Id.
[25] Id. at 797
[26] Stevenson v. State, 709 A.2d 619, 631 (Del. 1997); Riley v. State, 496 A.2d 997, 1018 (Del. 1985).
[27] 548 U.S. 140, 149 (2006) (citing Sullivan v. Louisiana, 508 U.S. 275, 282 (1993).
[28] Gonzalez-Lopez, 548 U.S. at 152
[29] Gonzalez-Lopez, 548 U.S. at 152 (citing Wheat v. U.S., 486 U.S. 153, 163-64 (1988); Morris v. Slappy, 461 U.S. 1, 11-12 (1983)) (emphasis added).
[30] Stevenson, 709 A.2d at 631; Riley 496 A.2d at 1018.
[31] 679 A.2d 58, 64 (Del. 1996) (quoting Riley v. State, 496 A.2d 997, 1018 n.27 (Del. 1985); accord Ungar v. Sarafite, 376 U.S. 575, 589 (1964).
[32] Stevenson, 709 A.2d at 630-31. We quoted the Third Circuit's position as follow:

Desirable as it is that a defendant obtain private counsel of his own choice, that goal must be weighed and balanced against an equally desirable public need for the efficient and effective administration of criminal justice. The calendar control of modern criminal court dockets, especially in metropolitan communities, is a sophisticated operation constantly buffeted by conflicting forces. The accused's rights-such as those relating to a speedy trial, to an adequate opportunity to prepare the defense, and to confront witnesses-are constantly in potential or real conflict with the prosecution's legitimate demands for some stability in the scheduling of cases. The availability of prosecution witnesses is often critically dependent on the predictability of the trial list. That delays and postponements only increase the reluctance of witnesses to appear in court, especially in criminal matters, is a phenomenon which scarcely needs elucidation.
Id. (quoting U.S. ex rel. Carey v. Rundle, 409 F.2d 1210, 1214 (3d Cir. 1969).